IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KAAPA ETHANOL, L.L.C.,           )
                                 )
            Plaintiff,           )          7:05CV5010
                                 )
      V.                         )
                                 )
AFFILIATED FM INSURANCE,         )      REPORT, RECOMMENDATION
Company,                         )            AND ORDER
                                 )
            Defendant.           )


       Pending before the court are the motion for summary
judgment, or in the alternative, for partial summary judgment
filed by the defendant,(filing 124), and the motion for partial
summary judgment filed by the plaintiff, (filing 128).


       The parties have also filed Daubert motions and motions in
limine.  The defendant's motion challenges the admissibility of
the opinions of plaintiff's expert witness, Donald Malecki.
Filing 147.  The plaintiff's motions challenge the admissibility
of the testimony of defendant's expert, John Field, (filing 183);
and seek an order precluding the defendant from using or
referring to information acquired after it denied coverage to
defend against plaintiff's bad faith claim, (filing 187); and
precluding the defendant from referring to or introducing
evidence concerning faulty workmanship, faulty construction, or
faulty design at trial, (filing 192).


       Much of the evidence submitted on the Daubert motions and
motions in limine is included in the summary judgment record, and
the ruling on the dispositive motions substantially impacts the
resolution of the evidentiary motions.

Each of the foregoing motions have been referred to the undersigned for a report and recommendation.  This report and recommendation will first address the parties' summary judgment motions.  The legal issues raised in these motions are intertwined and, accordingly, the summary judgment motions and evidence supporting or opposing them will be addressed together.

The report and recommendation on the Daubert motions and motions in limine will be addressed thereafter.

### SUMMARY JUDGMENT MOTIONS

SUMMARY OF ISSUES

As more specifically described in this court's prior memorandum and order denying the plaintiff's motion to file a second amended complaint, (filing 182), the plaintiff, KAAPA Ethanol, L.L.C., ("KAAPA"), has filed a breach of contract action seeking declaratory relief, compensatory and punitive damages, and attorney fees against the defendant, Affiliated FM Insurance, Company, ("Affiliated FM").  KAAPA claims it sustained damages to its ethanol facility at Minden, Nebraska ("the Minden plant") that are covered losses under an all-risk property insurance policy issued by Affiliated FM, and Affiliated FM has failed and refused to pay amounts owed to KAAPA under that policy.  Affiliated FM denies that plaintiff experienced any covered losses, and specifically alleges that KAAPA's damages were caused by perils excluded from coverage under the policy.

KAAPA's motion for partial summary judgment seeks a judgment against Affiliated FM on the issue of liability.  Specifically, KAAPA asks the court to find, as a matter of law, that nine of

2

its Minden plant tanks (such tanks being more specifically
described in the statement of facts below) were:

      --   damaged by earth movement in the form of subsidence;
          and/or

      --   collapsed;

and therefore KAAPA's resulting repair costs, expenses, and
business interruption losses are covered under its Affiliated FM
policy.  See filing 128.

     As more specifically set forth in its brief, Affiliated FM's
motion for summary judgment asks the court to find, as a matter
of law, that:

      --   KAAPA's alleged damages were caused by the following
          perils excluded from coverage under the terms of the
          policy:

            •    faulty workmanship;
            •    latent defect; and
            •    settling (in the absence of "collapse").

      --   KAAPA cannot recover for losses due to "earth
          movement;"

      --   KAAPA cannot recover for "collapse" of its tanks;

      --   KAAPA cannot recover its business interruption losses
          because they were caused by perils excluded from
          coverage under the policy.

      --   KAAPA cannot recover losses under the "duty to
          mitigate" provisions of the policy.

      --   The "Protection and Preservation of Property" provision
          of the policy does not afford KAAPA a basis for
          recovering the amounts it spent on repairing the Minden
          plant.

-- KAAPA lacks evidence supporting its claim that
   Affiliated FM acted in bad faith when it investigated
   and denied KAAPA's claims.

-- Under Nebraska law, KAAPA cannot recover punitive
   damages for Affiliated FM's alleged breach of the all-
   risk policy.

Affiliated FM's alternative motion for partial summary
judgment seeks a ruling that KAAPA's claims based on damage to
the Minden plant's "process liquid tanks" are not covered because
these damages were not manifested during the term of the policy.

Upon review of the evidence and legal arguments, the
undersigned recommends that the plaintiff's motion for partial
summary judgment be denied, and that the defendant's motion for
summary judgment be granted in part as more specifically set
forth hereafter.

STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue
of material fact and the moving party is entitled to judgment as
a matter of law. Fed.R.Civ.P. 56(c); Matsushita Elec. Ind. Co.
v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v.
Catrett, 477 U.S. 317, 322 (1986). "Rule 56(c) of the Federal
Rules of Civil Procedure mandates the entry of summary judgment
against a party 'who fails to make a showing sufficient to
establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at
trial.'" Duluth, Winnipeg and Pacific Ry. Co. v. City of Orr,
529 F.3d 794, 797 (8th Cir. 2008)(quoting Celotex, 477 U.S. at
322). In deciding a motion for summary judgment, the facts and
all reasonable inferences are to be viewed in the light most

4

favorable to the nonmoving party.  Duluth, Winnipeg, 529 F.3d at 797.

UNDISPUTED FACTS

The following statement of undisputed facts parallels the parties' submissions and corresponds with the level of detail and specificity set forth in the parties' briefs.  Though not every fact discussed hereafter may be "material" to the underlying issue of whether coverage exists under the policy at issue, these facts are nonetheless helpful in understanding the parties' dispute and are included to assist the trial judge's ruling on the pending motions for summary judgment.  To the extent that facts set forth in the parties "Statement of Undisputed Facts" were determined to actually be in dispute, those facts are not set forth hereafter but are referenced and discussed, as appropriate, in the body of the legal discussion.

The undisputed facts cited and referenced to the court in the parties' summary judgment briefs are as follows:

KAAPA operates an ethanol refinery plant in Minden, Nebraska (the "Minden plant").  Construction of this facility began in September 2002, (filing 160-2, ex. XX (Ostgren deposition), at CM/ECF p. 43; ex. YY (E. Fagen deposition), at CM/ECF p. 46), and the plant went into operation on or about November 20, 2003. Filing 44, ¶¶ 13; filing 130-6, ex. E (Gerhart deposition), at CM/ECF p. 5 ("Distillation started on the 25th of November, 2003").

KAAPA contracted with Fagen, Inc. and Fagen Engineering ("Fagen") to build the plant.  Aaron Fagen was initially in charge of the project, and Evan Fagen completed the project. Filing 125-2, ex. B. (KAAPA 30(b)(6) deposition), at CM/ECF p. 23.

KAAPA's Minden plant was designed to include several tanks for ethanol production.  The facility's three fermentation tanks and the beerwell tank are very large and are located adjacent to one another in what is referred to as the "fermentation area" of the facility.  The beerwell tank is designed to hold 980,000 gallons and is approximately 60 feet in diameter and 45 feet high; the fermentation tanks are designed to hold 730,000 gallons and are approximately 50 feet in diameter and 30 feet high.  The facility also includes five smaller tanks (the syrup, whole stillage, thin stillage, cook water, and methanator feed tanks, hereinafter collectively referred to as the "process liquid tanks"), each with a diameter of at least 16 feet.  The methanator feed, cook water, and thin stillage tanks each hold 146,000 gallons; the whole stillage and syrup tanks each hold 50,000 gallons.  Filing 44, ¶¶ 8-10; filing 125-2, ex. A. (6/20/2002 Mid-State report), at CM/ECF p.34; filing 125-3, ex. D (Knott deposition), at CM/ECF p. 3; ex. E (Boring and Test location map), at CM/ECF p. 16; filing 130-6, ex. E (Gerhart deposition), at CM/ECF pp. 3-4, 12.   The following diagram depicts the layout of the Minden plant site.



[Filing 125-3](#), ex. E (Boring and Test location map), at CM/ECF p.
16).

    Before beginning construction of the Minden plant, Fagen
retained the services of Mid-State Engineering ("Mid-State") to
conduct a geotechnical investigation and determine whether the
soil at the plant site had sufficient bearing capacity to provide
a stable foundation for the tanks.  [Filing 125-2](#), ex. C
(6/20/2002 Mid-State report), at CM/ECF p. 27.  On June 20, 2002,
Mid-State reported that the existing silty lean clay soil at the
site might not support the anticipated load of the fermentation
and beerwell tanks.  Accordingly, Mid-State recommended that
"[i]n order to minimize and control total and differential
settlements, . . . liquid storage tanks with diameters greater
than 10' (loaded up to 4000 psf) be supported by a compacted
soils raft reinforced with Tensar grid, or equivalent."  [Filing
125-2](#), ex. C (6/20/2002 Mid-State report), at CM/ECF p. 34.

7

A "Tensar Biaxial Geogrid" is a weblike material that, when installed properly to create a soils raft, improves the load-bearing capacity of soft soil by distributing the load over a wider area, "similar to the way a snowshoe works to distribute a man's weight over soft snow." Filing 125-9, ex. SS (Tensar installation guide), at CM/ECF p. 34.  See also, filing 125-3, ex. G (Musilek deposition), at CM/ECF p. 64; filing 125-4, ex, H (Ostgren deposition), at CM/ECF p. 5 (describing the geogrid fabric as resembling a "plastic snow fence)".

Fagen hired the Jim Ostgren Construction Company ("Ostgren") to over-excavate and re-compact two areas at the Minden plant where the tanks were to be erected.  Filing 125-4, ex. I (Ostgren 4/27/05 letter), at CM/ECF p. 10; filing 131-6, ex. H (Woodside deposition), at CM/ECF pp. 3-4.  During the fall of 2002, Ostgren excavated the soil to a depth of approximately fifteen feet to prepare for installing the geogrid and building the soils raft. Filing 125-4, ex, H (Ostgren deposition), at CM/ECF p. 5   Once the soil was removed, a Mid-State representative (Schnackenberg) tested the soil at the bottom of the hole and confirmed that a geogrid should be installed because the soil was soft.  This recommendation was conveyed to Fagen, who responded by ordering the Tensar geogrid fabric and installing a layer at the bottom of the hole.  Ostgren then covered the geogrid with two feet of the silty lean clay excavated at the site and compacted the dirt. The level of compaction was tested and approved by Mid-State. The process of laying geogrid and covering it with onsite soil compacted to Mid-State's specifications was then repeated until a five-layer soils raft was created that extended 140 feet by 160 feet, each layer being approximately two feet deep.  The remaining four to five feet at the top of the fifteen-foot deep hole dug by Ostgren was filled with compacted soil from the site.

8

Filing 125-4, ex, H (Ostgren deposition), at CM/ECF pp. 5-8; ex. J (E. Fagen deposition), at CM/ECF p. 22; ex. K (9/17/02 fax instructions-Fagen to Ostgren), at CM/ECF p. 25; ex. L (9/18/02 faxed bid-Ostgren to Fagen), at CM/ECF pp. 29-30; ex. M (Beckman Geotechnical report), at CM/ECF p. 41; filing 125-5, ex. N (Mid-State compaction test report), at CM/ECF p. 2-13.

The manufacturer of the Tensar geogrid recommends that each layer of the grid be filled with a permeable crushed aggregate. If this recommendation is followed, a soils raft built with geogrid has the capability of achieving a bearing capacity of 4,000 psf. Filing 125-4, ex. M (Beckman Geotechnical report), at CM/ECF p. 41. However, the soils raft built at the Minden plant was filled with onsite soil instead of the permeable crushed aggregate.

Once the soils raft with geogrid was installed, Fagen began building the concrete foundation for the tanks. Three-foot deep circular trenches were dug and concrete footings were poured. Rebar-reinforced concrete was then poured to form "ring wall" foundations for placement and support of the circular tank walls. Filing 125-4, ex. J (E. Fagen deposition), at CM/ECF pp. 13-14; filing 125-5, ex. P (Finch deposition), at CM/ECF p. 18. These ring wall foundations are also often referred to in the record as "stem walls." See e.g., filing 130-6, ex. E (Gerhart deposition), at CM/ECF p. 6.

The tank floors are cone-shaped. Based on the construction design, the tank walls were to be seated on and anchor bolted to the ring wall foundations with the cone of the tank floors extending downward into the void encompassed by the ring wall. The following diagram depicts the intended construction design.

9



[Filing 125-5](#), ex. O (Ninyo & Moore diagram), at CM/ECF p. 15.

        Concrete was poured to create the ring walls, and after the
concrete cured, the interior of each ring wall foundation was
infilled at a downward slope that corresponded with the shape of
the conical tank floor to be installed upon that ring wall.  The
purpose of this infill was to provide support for the tank floor.
[Filing 125-3](#), ex. D (Knott deposition), at CM/ECF p. 12; [filing
125-4](#), ex. J (E. Fagen deposition), at CM/ECF pp. 13-14; ex. M
(Beckman Geotechnical report), at CM/ECF p. 41; [filing 125-5](#), ex.
P (Finch deposition), at CM/ECF p. 18; [filing 125-9](#), ex. TT
(Schnackenberg deposition), at CM/ECF pp. 41-42.  Although the
structural engineering plans called for using compacted granular
fill within the ring walls to support the tank floors, ([Filing
125-4](#), ex. M (Beckman Geotechnical report), at CM/ECF p. 41;

10

filing 125-5, ex. P (Finch deposition), at CM/ECF p. 18; ex. Q,
(engineering design diagram), at CM/ECF p. 20; ex. R,
(engineering design diagram), at CM/ECF pp. 31, 34); ex. R-
304(24x36); ex. R-310(24x36)(see filing 197)), compacted onsite
silty lean clay was used.  Filing 125-4, ex. M (Beckman
Geotechnical report), at CM/ECF p. 41.

     WINBCO Tank Company ("WINBCO"), the tank manufacturer, then
arrived at the site, constructed the stainless steel tanks, and
installed them on the foundations.  Filing 125-3, ex. D (Knott
deposition), at CM/ECF p. 3; filing 125-4, ex. J (E. Fagen
deposition), at CM/ECF pp. 19-20.  The fermentation and beerwell
tanks were filled with water to check for leakage.  Although each
of these tanks settled approximately two inches when filled, this
degree of settlement was within Mid-State's "total predicted
settlement" for the large storage tanks and was considered
normal.  Filing 44, ¶¶ 35-36; filing 125-2, ex. C (6/20/2002 Mid-
State report), at CM/ECF p. 35; filing 125-4, ex. M (Beckman
Geotechnical report), at CM/ECF p. 42.  Plant operations began
thereafter on November 20, 2003.  Filing 44, ¶ 13.

     On August 22, 2004, KAAPA purchased an all-risk property
insurance policy, (policy number EG567), from Affiliated FM which
provided coverage for the Minden plant for a period beginning on
August 22, 2004 and originally scheduled to end on November 25,
2005.  The policy provided coverage "against all risks of direct
physical loss or damage to the insured property except as
excluded under [the] policy."  Filing 125-3, ex. F (policy), at
CM/ECF p. 25.  The policy's "Protection and Preservation of
Property" clause further stated:

          This policy covers the reasonable and necessary costs
          incurred to temporarily protect or preserve insured

                              11

property, at a described location, in order to avoid or
prevent immediately impending physical loss or damage
from a peril insured by this policy.

Filing 125-3, ex. F (policy), at CM/ECF p. 26.  Under the policy,
Affiliated FM "shall not be liable for loss by . . . perils
insured against in this policy caused, directly or indirectly, by
. . . [the] neglect of the insured to use all reasonable means to
save and preserve the properly at and after a loss. . . ."

     Filing 125-3, ex. F (policy), at CM/ECF p. 19.


     Section E  of the policy provided a listing of perils
excluded from coverage.  The excluded perils in Section E were
divided into two separate groups.  As relevant to the arguments
raised by the parties in this case, the policy stated:


**E. PERILS EXCLUDED**

     **GROUP I.** This policy does not insure against loss or damage
     caused directly or indirectly by or resulting from any of
     the following.  Loss or damage is excluded regardless of any
     other cause or event whether or not insured under this
     policy that contributes concurrently or in any sequence to
     the loss or damage.

     . . .

     8.     Any natural or man-made earth movement, including but
            not limited to:

            a. Earthquake;

            b. Landslide,

            c. Mudflow;

            d. Earth sinking, earth rising or shifting; or

            e. Subsidence;

12

Resulting from, contributed to or aggravated by any of the
above.  Loss by fire, explosion or sprinkler leakage ensuing
from any of the above is covered by this policy.

Filing 125-3, ex. F (policy), at CM/ECF pp. 34, 36.

. . .

**GROUP II.**  This policy does not insure against loss or
damage caused by the following perils; however, if loss or
damage not excluded results, then that resulting loss or
damage is covered.

1. . . ., latent defect, . . . .

2. . . ., faulty workmanship, faulty construction or
faulty design.

. . .

7. Settling . . . of:

a. Foundations.
b. Walls.
c. Floors.

. . .

This exclusion will not apply to loss or damage
resulting from collapse of:  a building or structure;
or material part of a building or structure.

Filing 125-3, ex. F (policy), at CM/ECF pp. 34, 37-38.


The Group II exclusions were subject to a resulting or
"ensuing loss" clause.  As to those perils listed in Group II,
even if the "policy does not insure against loss or damage caused
by [a peril listed in Group II], . . . "if loss or damage not
excluded results, then that resulting loss or damage is covered."
In contrast, the perils listed in Group I were not subject to an
ensuing loss clause.  Rather, as to Group I perils, "[l]oss or
damage is excluded regardless of any other cause or event whether
or not insured under this policy that contributes concurrently or

13

in any sequence to the loss or damage." Filing 125-3, ex. F
(policy), at CM/ECF pp. 34, 37-38.

       The exclusion for perils caused by natural or man-made earth
movement was deleted from the policy "in its entirety" by an
"Earth Movement Endorsement" to the policy.  Filing 125-3, ex. F
(policy), at CM/ECF p. 52.  Although the Earth Movement
Endorsement states it was provided to KAAPA "[i]n consideration
of additional premium," KAAPA did not pay, and was not asked to
pay an additional premium for this endorsement because Affiliated
FM's underwriting department deemed the risk of exposure to earth
movement claims in Nebraska too low to warrant charging an
additional premium.  Filing 160-2, ex. VV (Mackin deposition), at
CM/ECF pp. 3-6.

       The Earth Movement Endorsement does not define "earth
movement," but does state:

       Each loss by earth movement will constitute a single
       claim under this policy.  If more than one earth
       movement shock occurs within any period of 72 hours
       during the term or this endorsement, such shocks will
       be considered to constitute a single earth movement.

Filing 125-3, ex. F (policy), at CM/ECF p. 52.  The endorsement
states Affiliated FM will not be liable for any loss caused by
any earth movement shock occurring before the effective date or
after the expiration date of the policy.

       The "Business Interruption Endorsement," (filing 125-3, ex.
F (policy), at CM/ECF pp. 48-51), states:

14

**1. Coverage Provided:**

In consideration of additional premium, this policy is extended to cover at locations described in the declarations:

**A.**   The actual loss sustained by the Insured due to the necessary interruption of business during the period of interruption, and 30 consecutive days following that period;

**B.**   Expenses, over and above normal operating expenses, that must be incurred by the Insured:

1)   In making up lost production; and

2)   To reduce loss payable under this endorsement;

Resulting from direct physical loss or damage from perils insured by this policy to insured property utilized by the Insured.  This company will not pay for any expense more than it would have paid had the Insured been unable to make up any lost production, or to continue any business operations or services.

Filing 125-3, ex. F (policy), at CM/ECF p. 48.


On September 1, 2004, KAAPA noticed that "fermenter number three ha[d] pulled in," . . .  "the lip of the [tank's] base was no longer sitting on the [concrete stem wall].  You could actually see inside the concrete stem wall."  Filing 130-6, ex. E (Gerhart deposition), at CM/ECF p. 6.  KAAPA promptly provided notice of the potential problems, along with photographs, to Fagen.


Between November 2003 and September 2004, "a significant amount of differential settlement"[1] had occurred across each of

_____

[1]The plaintiff has denied several of the defendant's statement of facts, explaining that it does not concede that "settlement" within the meaning of the policy occurred.  The use

the fermenter and beerwell tanks, with as much as 4.3 inches of
settlement measured on the southeast side of fermentation tank
one.  Filing 125-4, ex. M (Beckman Geotechnical report), at
CM/ECF p. 42.  The beerwell tank was no longer plumb, was leaning
four inches to the east, and appeared to be "tipping." Filing
125-5, ex. S, (Woodside emails of 10/20-23/2004), at CM/ECF pp.
48-49.   The center of the fermentation and beerwell tanks had
"undergone some significant amounts of settlement." Filing 125-
4, ex. M (Beckman Geotechnical report), at CM/ECF p. 43.  Several
sections around the perimeter of the fermentation and beerwell
tanks were pulling inward, and the anchor bolts that attached the
tank walls to their ring wall foundations were being stressed and
rotated, causing chipping ("spalling") of the upper concrete
edges of the ring walls and gaps between the ring wall edges and
the tank walls.  These gaps allowed water to leak between the
ring wall and the tank wall and saturate the soil beneath the
tank floors.  Filing 125-3, ex. D (Knott deposition), at CM/ECF
p. 6; filing 125-4, ex. M (Beckman Geotechnical report), at
CM/ECF p. 43; filing 130-6, ex. E (Gerhart deposition), at CM/ECF
pp. 6-8; filing 131-6, ex. I (Fagen letter-9/30/2004), at CM/ECF
pp. 8-14.

     Fagan responded to KAAPA's concerns on September 14, 2004,
stating:

     Our current solution is to pump grout under the tank
     floor to fill the void between the tank floor and the
     fill which has settled or washed out of the pump

_____

of the word "settlement" in the court's statement of facts, or in
the records presented as evidence for the court's review, should
not be interpreted and does not necessarily mean that the ground
"settled" or a "settlement" occurred for the purposes of
determining coverage under the policy.

suction sleeve. . . .  We have been working on
solutions and will have Mark Palmer and Reid
Jurgenson on your plant site tomorrow morning (9-15-04)
to inspect the situation and relay our game plan.  Our
future design will include a 14" wall thickness to
prevent spalding [sic] and a cap of flowable fill to
prevent saturating and washout of interior fill.

Reid and Mark will also inspect the acid piping and
come up with a game plan for replacement.  Our solution
is to replace all of the affected piping, repair your
concrete and replace your insulation.

Filing 172-2, ex. A (A. Fagen email-9/14/2004), at CM/ECF p. 2.

On September 24, 2004, Travis Finch, a structural engineer
for Fagen, performed a visual study of the ring walls to
determine their ability to support KAAPA's three fermentation
tanks.  Finch observed:

At several locations on all four tanks, the movement of
the tank wall both inward and downward has spawled
(sic) the inside face of the 12 inch thick concrete
ring wall.  The tank wall and base plate have settled
down into the soil at these locations approximately 1
inch in some locations.

. . .

Now 10 months after start up it is obvious that the
soil supporting the tank bottom is settling at a
different rate than the soil supporting the concrete
ring wall, and it appears to be a direct result of the
moisture present in these low plasticity clays.

Filing 131-6, ex. I (Fagen letter-9/30/2004), at CM/ECF pp. 8-9.
The floors of the fermentation and beerwell tanks were "clearly
settling in the middle."  Filing 125-5, ex. S, (Woodside emails
of 10/20-23/2004), at CM/ECF p. 48.

Finch was concerned that if the tanks remained out of plumb,
the tank shells or tank base plates could be overstressed.  Under

17

the worst case scenario, the tanks could rupture, all the contents would spill out, and eventually the tanks would collapse. Filing 132-2, ex. K (Finch deposition), at CM/ECF pp. 5-7. If the tank ruptured, someone could get hurt, but when or if that would actually happen was unknown. Filing 160-4, ex. CCC (Tavlos deposition), at CM/ECF p. 4; filing 172-2 ex. E, (Knott deposition) at CM/ECF p. 24.

Under KAAPA's maintenance schedule, the fermentation tanks were drained and cleaned every eighteen hours. Filing 160-2, ex. WW (Gerhart deposition), at CM/ECF p. 10. The tanks are not opened and no one physically enters a tank to perform this scheduled cleaning. Filing 130-6, ex. E (Gerhart deposition), at CM/ECF p. 11. However, in September 2004, fermentation tank three was taken out of service after it was emptied for cleaning and evacuated with air so that the tank floor could be visually inspected from the manway. "Hills and valleys" (two to three inches in magnitude) were observed. Filing 160-2, ex. WW (Gerhart deposition), at CM/ECF p. 10; filing 172-2, ex. C (Gerhart affidavit), CM/ECF p. 11.

This rippling of the tank floor prevents complete drainage of the mash and cleaning fluid during the cleaning process. Although ethanol containing cleaning fluid is marketable as a fuel source, the bacterial growth caused by mash residue, and the high pH of the cleaning fluid left in the tank during ethanol production both deter the growth of yeast and the fermentation process, potentially reducing ethanol yields. Additional antibiotics can be purchased and used to control bacterial growth, but there is no known method for eliminating the effect of residual cleaning fluid in the fermentation tanks. Filing 160-2, ex. WW (Gerhart deposition), at CM/ECF pp. 10-11.

18

On or about November 2, 2004, KAAPA contacted WINBCO, (the tank manufacturer), sent it pictures of fermentation tank three, and requested WINBCO's assistance in determining if the fermentation and beerwell tanks were structurally sound. Filing 125-5, ex. T, (Gerhart email–11/3/2004), at CM/ECF p. 51; filing 160-2, ex. WW (Gerhart deposition), at CM/ECF pp. 14-15; filing 160-3, ex. AAA (KAAPA email to WINBCO–11/2/2004), at CM/ECF p. 10. WINBCO representatives inspected the site on November 4, 2004. They noted that the fermentation and beerwell tanks were asymmetrically "retreating" into their ring wall foundations, causing the tanks "to lean like the Leaning Tower of Pisa." Filing 125-5, ex. U, (Tavlos deposition), at CM/ECF pp. 54-56. Based on a visual assessment alone, without performing specific measurements, WINBCO concluded that due to differential settlement, the beerwell tank was no longer in compliance with the American Petroleum Institute's specifications of fabrication tolerances, specifically "API 650." Filing 125-3, ex. D (Knott deposition), at CM/ECF p. 7; filing 125-5, ex. T, (Gerhart email–11/3/2004), at CM/ECF p. 51; ex. U, (Tavlos deposition), at CM/ECF pp. 54-56; filing 132-2, ex. L (Knott memorandum–11/8/2004), at CM/ECF p. 9 ("[T]he Beer Well is 4 1/2" out of plumb which is 1 1/2" beyond API 650 tolerance requirements. In addition, the tank shells and basically the whole tank and its contents are not setting on the foundation ring wall.")[2]

---

[2]KAAPA's statement of facts includes testimony by Gerhart, a KAAPA employee, that during the November 4, 2004 inspection, one of the WINBCO representatives stated "it's not safe to be standing" near the tanks. Filing 130-7, ex. E (Gerhart deposition), at CM/ECF p. 3. Affiliated FM objects to this testimony as inadmissible hearsay.

Kermit Knott, one of the three WINBCO representatives who inspected the tanks, does not recall anyone on behalf of WINBCO

Immediately after the site inspection, the WINBCO
representatives traveled to Granite Falls, Minnesota to meet with
Fagen personnel and discuss WINBCO's findings. Filing 160-4, ex.
CCC (Tavlos deposition), at CM/ECF p. 4; filing 160-4, ex. FFF
(A. Fagen deposition), at CM/ECF p. 14. After receiving
information from WINBCO, Fagen promptly advised KAAPA that the
situation was "potentially more serious than previously thought,"
and instructed KAAPA to stop using the beerwell tank. Filing
125-5, ex. V, (Fagen letter–11/4/2004), at CM/ECF p. 58. Fagen
believed discontinuing the use of the beerwell tank was the
safest decision because it would avert the risk of damage to the
piping system and personal injury. Fagen was not, however,
concerned that the fermentation tanks would fall over. Filing
132-2, ex. O (A. Fagen deposition), at CM/ECF p. 25.

Fagan instructed KAAPA to produce the report of KAAPA's
engineer, and to have KAAPA's engineer meet with Fagen and its
engineers at the Minden plant the following morning "to come up

---

making such a statement, and did not believe the tanks posed any
imminent danger. Filing 160-3, ex. BBB (Knott deposition), at
CM/ECF pp. 14-15. John Tavlos, a WINBCO representative who was
also present, conveyed his specific concerns to Fagen and not
KAAPA. Filing 160-4, ex. CCC (Tavlos deposition), at CM/ECF p.
4. Knott's memorandum of the site visit did not state it was
unsafe to stand near the tanks, and the memorandum would have
included this warning had KAAPA been so instructed. Filing 160-
3, ex. BBB (Knott deposition), at CM/ECF p. 16; filing 160-4, ex.
DDD (Knott memorandum–11/8/2004), at CM/ECF p. 8.
     Based on the arguments raised in KAAPA's briefs, KAAPA
intends to use Gerhart's statement of what a WINBCO employee said
on November 4, 2004 as evidence to prove the KAAPA's tanks were
on the verge of "collapse," a peril allegedly covered under the
terms of its policy with Affiliated FM. The statement is
therefore being used for the truth of the matter asserted. As
offered by KAAPA against Affiliated FM, Gerhart's statement that
WINBCO told KAAPA "it's not safe to be standing" near the tanks
is an out-of-court statement and inadmissible hearsay.

with a solution" for repairing the fermentation and beerwell tanks. Filing 132-2, ex. N (Fagen letter-11/4/2004), at CM/ECF p. 22. Fagen met with KAAPA at the Minden plant on November 5, 2004 and repeated its instruction to take the beerwell tank out of service. Filing 130-7, ex. E (Gerhart deposition), at CM/ECF p. 4.

The beerwell tank was internally inspected after it was taken out of service. This inspection revealed that the center of the beerwell tank floor had sunk approximately eight inches lower than the original design, and the agitator shaft in the center of the tank had separated from its tripod base. Filing 125-4, ex. M (Beckman Geotechnical report), at CM/ECF p. 43.

KAAPA submitted a Property Loss Notice of claim to Affiliated FM through its insurance broker, Kevin Eukel of Hays Companies, on November 10, 2004. Filing 125-6, ex. BB (claim notice), at CM/ECF pp. 33-34.

On November 12, 2004, KAAPA's geotechnical expert, Ryan Beckman of Olsson Associates, issued a report which stated:

> Based on the overall settlement to date, the potential
> for additional consolidation to occur, the performance
> of the reinforced zone and the performance of the
> compacted fill zone, it is recommended that the
> foundation ring wall, interior foundation below the
> ring wall and zone directly below the interior floor
> slab within the ring wall be stabilized utilizing a
> compaction grouting technique. Not only will the
> compaction grouting technique provide the best
> economical opportunity to stabilize the underlying
> soils it also provides the owner the opportunity to
> bring the existing ring walls and floors slabs close to
> their original plan elevations. The grouting operation
> can also be completed in a manner that does not create

a significant amount of down time for the ethanol
plant.

Filing 125-4, ex. M (Beckman Geotechnical report), at CM/ECF p.
46.   Although Beckman anticipated further remedial measures may
be necessary to repair or stabilize the area below the tank
floors and within the ring wall, compaction grouting was
recommended as a method that could permanently stabilize the deep
soils below the ring wall footings and within the soils raft.
Filing 163-2, ex. A (Beckman deposition), at CM/ECF p. 4.


On November 15, 2004, Affiliated FM's claims adjuster, Keith
Anderson, and an engineer hired by Affiliated FM, Dick Van
Sickle, inspected the Minden plant "to discover the facts
surrounding the foundation settlement under four liquid process
tanks (3 fermentation tanks and one Beerwell tank)."   Filing 133-
3, ex. R (Van Sickle memorandum-12/14/2004), at CM/ECF p. 2.
Anderson and Van Sickle were provided with a copy of Beckman's
Geotechnical report and the proposal from Denver Grouting for
performing compaction grouting as a remedial measure.   Van Sickle
also reviewed Mid-State's June 2002 engineering report and
researched the "Tensar" geogrid system on the internet.   Filing
133-3, ex. R (Van Sickle memorandum-12/14/2004), at CM/ECF pp. 2-
3.   Van Sickle advised Anderson that compaction grouting was the
right thing to do.   Filing 133-3, ex. S (Anderson deposition), at
CM/ECF p. 22.[3]

---

[3]The record includes Van Sickle's memorandum of the November
15, 2004 inspection but no testimony from this witness.
According to his memorandum, Van Sickle spoke with KAAPA's
General Manager, Chuck Woodside who "described the settlement
problem as sufficiently serious as to require a shutdown of the
Beerwell tank."   The Van Sickle memorandum continues by stating:
"This was due to its 'out-of-plumb' state that threatens
structural buckling and possible collapse of the tank (stainless
steel, welded)."   Filing 133-3, ex. R (Van Sickle

Denver Grouting began the compaction grouting process at the Minden plant in November 2004.  The beerwell and fermentation tanks were, one by one, taken out of service to undergo grout compaction repairs.  The plant continued to operate, but at a reduced capacity.  Grout was injected at eight-foot intervals around the outside of each of the four ring wall foundations down to a depth exceeding 40 feet and up to the base of the foundation footings.  Grout was also injected through between 24 and 28 holes cut into each tank floor in an attempt to stabilize the area directly beneath the tanks.  Filing 125-6, ex. Y (Gerhart deposition), at CM/ECF pp. 14-15; ex. X (Denver Grouting proposal), at CM/ECF pp. 2-4; filing 130-7, ex. E (Gerhart deposition), at CM/ECF p. 7; filing 172-2, ex. C  (Gerhart affidavit), CM/ECF p. 11.  WINBCO welded the tank floor holes shut when the compaction grouting was complete.  Filing 125-3, ex. D (Knott deposition), at CM/ECF pp. 10-11.

Due to the movement of the tanks, some of the pipes leading in and out of the fermentation tanks were bent.  These pipes were repaired, and the suction piping was modified to relieve stress on the piping.  Filing 130-7, ex. E (Gerhart deposition), at CM/ECF p. 7; filing 172-2, ex. C  (Gerhart affidavit), CM/ECF p. 11.  In addition, when the tank floors sank, the center agitators of all three fermentation tanks and the beerwell tank dislodged from their pedestal housings located at the base apex of the tanks.  The agitators were repaired by increasing the height of the pedestal bases and installing new Teflon bushings into the

memorandum–12/14/2004), at CM/ECF p. 2.  The plaintiff states the foregoing sentence reflects Van Sickle's opinion; the defendant states the sentence merely reiterates what Woodside told Van Sickle.  Filing 129, p. 15, ¶ 57; filing 159, p. 9, ¶ 57.  This conflicting interpretation of Van Sickle's memorandum cannot be resolved based on the record before the court.

23

agitator shafts.  The agitator repairs took approximately three
hours to complete and were performed immediately before the tanks
were placed back into service.  Filing 125-6, ex. Y (Gerhart
deposition), at CM/ECF pp. 16-17.

     WINBCO tested the rippled tank floors and found no leaks
requiring repair.  Filing 125-3, ex. D (Knott deposition), at
CM/ECF pp. 10-11; filing 125-6, ex. AA (Woodside to Fagen email-
11/12/2004, at CM/ECF p. 30. (Ex. D at 58:3-16, 112:14-113:11;
Ex. AA, 11/12/04 email).  The Minden plant returned to full
capacity operations in January 2005.  Filing 125-6, ex. Y
(Gerhart deposition), at CM/ECF p. 17.[4]

     On December 16, 2004, defendant's claims adjuster, Keith
Anderson, contacted Kevin Eukel of Hays Companies and advised
Eukel that Affiliated FM was denying coverage on the claim
submitted by the plaintiff on November 10, 2004.  Filing 125-6,
ex. DD (Eukel memorandum-12/16/2004), at CM/ECF p. 44.  Eukel
provided assistance and consultation to KAAPA in submitting
claims related to the damage and repair of the Minden plant
tanks.  Filing 125-6, ex. CC (Eukel deposition), at CM/ECF p. 37,
39-40.  Eukel notified KAAPA that Affiliated FM would be denying
their claim, and stated he would revisit the issue and discuss
KAAPA's options on pursuit of coverage through Affiliated FM
once he received the defendant's coverage position, but he
further warned:  "Prospect [for coverage] minimal given cause of
loss settlement" [sic] is specifically excluded."  Filing 125-6,

_____

     [4]Although the defendant's listing of undisputed facts states
the plant returned to full operations in December 2004, (filing
126, p. 11, at ¶ 43), and the plaintiff's brief admits this
statement of fact, (filing 162, p. 7, at ¶ 43), the factual
record cited by the defendant states full operations began in
January 2005.

ex. DD (Eukel memorandum–12/16/2004), at CM/ECF p. 44.  Eukel
believed it was unlikely he would be able to convince Affiliated
FM to reverse its position and provide coverage.  Filing 163-2,
ex. B (Eukel deposition), at CM/ECF pp. 13-14.

Affiliated FM's written denial of coverage was sent to KAAPA
on January 20, 2005.  Filing 125-6, ex. EE (FM Affiliated claim
denial–1/20/2005), at CM/ECF pp. 46-48.  The denial of coverage
was based on the previously quoted policy provisions excluding
coverage for damages caused by faulty workmanship, a latent
defect, or settling.

KAAPA filed the above-captioned lawsuit against Affiliated
FM on June 29, 2005.  Filing 1.

KAAPA noticed potential additional issues with the
fermentation and beerwell tanks in August 2005.  Filing 130-7,
ex. E (Gerhart deposition), at CM/ECF p. 12.  On November 8,
2005, KAAPA sent a letter to Eukel stating the compaction
grouting had not resolved the problems with the fermentation and
beerwell tanks, and these tanks were continuing to be damaged by
"earth movement, subsidence and collapse of the foundation"
beneath the tanks in the fermentation area of the plant.  The
process liquid tanks were not mentioned in the letter.  Filing
125-5, ex. W, (KAAPA letter to Eukel–11/8/2005), at CM/ECF pp.
60-62.  Eukel forwarded the letter to Affiliated FM.  Filing 125-
6, ex. GG (FM Affiliated claim acknowledgment letter–11/28/2005),
at CM/ECF p. 53.

KAAPA cancelled its policy with Affiliated FM effective
November 14, 2005.  Filing 125-9, ex. QQ (Glasgow
email–11/15/2005), at CM/ECF p. 24.

On November 28, 2005, Affiliated FM sent a letter to KAAPA
stating it had opened a new claim file in response to KAAPA's
letter dated November 8, 2005, and that it would investigate
KAAPA's new claim.  The defendant's letter requested materials
and information regarding the plaintiff's "new" and "additional"
problems, but further re-affirmed its previous denial of coverage
for any claims arising from faulty workmanship, a latent defect,
or settling.  Filing 125-6, ex. GG (FM Affiliated claim
acknowledgment letter-11/28/2005), at CM/ECF pp. 53-54.

No settling problems were observed with any of the process
liquid tanks in the fall of 2004.  Filing 126, p. 10, at ¶ 37;
filing 162, p. 6, at ¶ 37.  However, on November 30, 2005,
Woodside (who works for KAAPA), along with engineer Shane
Ellickson of Shoemaker & Haaland, a tank engineering firm
utilized by Karges-Faulconbridge,[5] removed the insulation from
the thin stillage tank (one of the five process liquid tanks) to
evaluate the extent of damage to that tank.  Filing 125-7, ex. II
(KAAPA timeline), at CM/ECF p. 4.  Woodside and Ellickson
observed damage that appeared to be due to settlement in excess
of tolerated limits.

On December 2, 2005, KAAPA notified WINBCO that KAAPA's thin
stillage tank was starting to pull off its foundation, the floor
was buckling, and some of the anchor bolts were being pulled.
WINBCO responded:

> After reviewing the attached photos, it is obvious
> there has been considerable movement of the tank bottom

---

[5]KAAPA was, at that time, considering a 110-million-gallon
expansion project for the Minden plant, with the expansion
project to be engineered by Karges-Faulconbrige.  Filing 160-2,
ex. WW (Gerhart deposition), at CM/ECF p. 35.

26

and that portions of the shell are no longer supported by the foundation ring-wall.

As the foundation tank no longer complies with API Standards, we highly recommend that the tank be taken out of service as the tank shell/bottom is more than likely over stressed and may fail.

It also appears that this is similar to the foundation issues in the Fermentation Area and corrective action should be addressed in a like manner.

Filing 133-6, ex. X (KAAPA-WINBCO email exchange–12/2/2005), at CM/ECF p. 2.

Ellickson provided the following engineering report to KAAPA on December 13, 2005.

During our site visit we observed that the base of the [thin stillage tank] shell has been pulled inward causing the level transmitter to rotate downward. Based on our observations and calculations, these movements are atypical for this type of tank and have likely been caused by settlement of the bottom plate similar to what has been seen in the fermenter and beer well tanks. While some settlement can be expected and tolerated with this type of foundation, the inward movement of the shell would indicate that the settlement is in excess of allowable levels and that the bottom and shell plates are overstressed.

Another problem associated with the movement of the shell is that, if the movement is large enough, the shell will move off of the wall and no longer be supported by the concrete. In fact, the shell does not even have to move completely off the wall to cause problems. If it gets too close to the inside edge of the wall, the top edge of the wall can break off due to the weight of the shell and roof. On the north-east side of the tank it appears that this has already occurred. Between two of the anchor bolts a space could be seen between the bottom plate and the inside of the face of the concrete. It appears that at this location the inside face of the ringwall has spalled off.

27

> Therefore we recommend that the foundation of this tank
> be reviewed and repaired as necessary to prevent
> additional settlement of the bottom and movement of the
> shell.  We would also recommend that the shell of the
> tank be restored to remove the inward movement that has
> occurred.

Filing 125-7, ex. JJ (Woodside email-12/15/2005), at CM/ECF p. 9.

On December 15, 2005, KAAPA advised Fagen and others that
KAAPA would be removing the insulation from the remaining four
process liquid tanks "to see if the same problem is happening."
Filing 125-7, ex. JJ (Woodside email-12/15/2005), at CM/ECF p. 9.
The insulation was removed from the other four process liquid
tanks on January 4-6, 2006, at which time KAAPA observed settling
problems with those tanks as well.  Filing 125-6, ex. Y (Gerhart
deposition), at CM/ECF pp. 19-20.  As to all of the process
liquid tanks, spalling had occurred on the ring wall edges and
the tank walls were being pulled inward off the ring wall.  As to
one of the tanks, the outflow at the base of the tank went uphill
rather than downhill.  Filing 130-5, ex. C (KAAPA 30(b)(6)
deposition), at CM/ECF pp. 4-5.

KAAPA submitted a preliminary proof of loss statement on
April 19, 2006, (filing 160-5, ex. OOO (proof of loss-4/19/2006),
at CM/ECF p. 21), and filed a second sworn proof of loss
statement to Affiliated FM on September 29, 2006.  The September
2006 proof of loss statement was accompanied by documents
supporting KAAPA's claim for lost business income and written
estimates for repairing KAAPA's tanks.  Filing 133-5, ex. W
(proof of loss-9/26/2006), at CM/ECF p. 2.

KAAPA initiated further repairs of the beerwell tank,
fermentation tanks, and process liquid tanks in November 2006.

28

The grout injections performed by Denver Grouting had stabilized the ring wall foundation footings and the soil extending below the depth of these footings.  However, the soil within the ring wall was continuing to move and consolidate and, as a result, the tank floors were not adequately supported.  Filing 125-7, ex. KK (Olsson memo–11/1/2006), at CM/ECF p. 13.  KAAPA therefore removed the existing tank floors, removed the silty clay previously used to infill the ring walls, and replaced that material with a "lean pour concrete mix" topped with "compacted sand" and sloped to match the slope of the tank floors.  Filing 125-6, ex. FF (Tank repair narrative), at CM/ECF pp. 50-51; filing 125-7, ex. KK (Olsson memo–11/1/2006), at CM/ECF p. 13; ex. LL, (11/21/2006 to 11/29/2006 emails), at CM/ECF pp. 15-18. The repairs, which were performed by taking one large tank and two small tanks out of service at a time, were completed by July 2007.  Filing 132-3, ex. Q (Ninyo & Moore report–12/13/2007), at CM/ECF pp. 10-11.  The tanks were successfully fixed.  Filing 126, p. 15, at ¶ 61; filing 162, p. 9, at ¶ 61.

    On March 14, 2007, Affiliated FM sent its written notice denying KAAPA's claims.  As to the process liquid tanks specifically, it denied these claims as occurring beyond the policy term because the damage was not manifested before the policy was cancelled on November 14, 2005.  As to all the tanks, the defendant denied coverage based on the policy exclusions for faulty workmanship, latent defect, and settling.  The letter explained:

        Based on representations by you and your
        contractors/consultants, we understand that the
        conditions, the cause of, and the proposed repairs for
        the remaining five tanks are substantively the same as
        those for the first four tanks.  It is on the foregoing

basis that we are providing our determination of
coverage for your claim.

The information you have provided indicates that during
the construction of the tanks, incorrect and/or
inappropriate soils were used to fill in the area of
each tank's ringwall foundation. These soils (the
"Infill") fill the space between the ground and the
conical floor of each tank within each ringwall
foundation. Each of the nine tank floors has settled
due to insufficient support from the Infill.  This
settling has allegedly compromised the tank floors,
walls, and foundations, as well as various pipes,
pumps, and other equipment connected to the tanks.  As
the tank floors settled, this pulled on the tanks'
walls and shifted the tanks' weight on top of the
ringwalls. In some places, the ringwall cracked and
anchor bolts on the ringwall were bent.

. . .

The information you have provided to date indicates
that all the tanks were affected by settling caused by
faulty workmanship, faulty construction and latent
defect.  The use of incorrect and or inappropriate
Infill during the construction of the tanks caused the
problems for which KAAPA is making claim.  This
constitutes faulty workmanship and/or faulty
construction, both excluded causes of loss.  The
incorrect and/or inappropriate Infill was hidden from
discovery inside the ringwalls and underneath the tank
floor.  As such, the Infill constitutes a latent
defect.  The insufficient support of the Infill caused
the tank floors to settle.  Losses caused by latent
defects are excluded from coverage.  Further, the tank
foundations, walls, and floors were affected by
settling, cracking and bulging, all of which are
excluded causes of loss.

Filing 125-7, ex. MM (FM Affiliated claim denial–3/14/2007), at
CM/ECF pp. 23-24.

Affiliated FM denied KAAPA's claim for recovery of business
interruption losses, explaining that "[s]ince the loss or damage
is not covered under the policy, there is no coverage for any

associated Time Element type loss."  The denial letter further
stated "[t]he conditions observed and described do not constitute
a collapse," and as to "earth movement" coverage, there was no
"evidence of seismic activity that might have affected the
tanks."  Filing 125-7, ex. MM (FM Affiliated claim
denial-3/14/2007), at CM/ECF p. 24.  The letter did not discuss
coverage under the policy's ensuing loss provisions.  Filing 125-
7, ex. MM (FM Affiliated claim denial-3/14/2007), at CM/ECF p.
21-26.

      The plaintiff outlines several statements of fact in the
body of its briefs that, for some unexplained reason, are never
set forth in its statements of undisputed fact.  See filing 129,
pp. 22-24; filing 162, at pp. 37-39.  These facts relate to its
claim that Affiliated FM acted in bad faith.  The court could
disregard these statements of fact for failure to comply with its
local rules.  However, the defendant's motion for summary
judgment seeks judgment as a matter of law on plaintiff's bad
faith claim.  Therefore, in the interest of assisting the trial
judge in resolving this case on the merits, the following
outlines whether the plaintiff's factual statements in support of
its bad faith claim are supported by its citations to the record.

      The plaintiff's brief opposing defendant's motion for
summary judgment on the bad faith claim states:

•    Keith Anderson, the General Adjustor assigned to KAAPA's
     claim, had no experience investigating or adjusting a claim
     factually similar to KAAPA's.  Filing 129, p. 22.

            In the cited record, Anderson testifies that with
            respect to claims raising settling, subsidence, or
            earth movement issues, his past experience was limited

31

to one earthquake claim. Filing 133-3, ex. S (Anderson deposition), at CM/ECF p. 6.

- When Anderson visited the Minden plant to investigate KAAPA's first claim, he was accompanied by Dick Van Sickle, an engineering consultant retained by Affiliated FM, who, like Anderson, lacked experience investigating claims involving the issues of settling, subsidence, or earth movement. Filing 129, p. 22.

    In the cited record, Anderson testified that he had worked with Van Sickle, an engineer, on one prior claim, and that claim did not involve settling, subsidence, or earth movement issues. Filing 133-3, ex. S (Anderson deposition), at CM/ECF p. 6.

- Anderson does not recall whether he even received a full copy of the KAAPA's policy, or knew that coverage for earth movement existed under the policy, before he visited the Minden plant on November 15, 2004. Filing 129, p. 22.

    The cited record supports this statement. Anderson also testified that after visiting the site and collecting information, he "reviewed the policy and . . . then made a determination." Filing 133-3, ex. S (Anderson deposition), at CM/ECF p. 7. See also, filing 125-6, ex. EE (FM Affiliated claim denial-1/20/2005), at CM/ECF pp. 46-48.

- Anderson had no real understanding of what the "Earth Movement Endorsement" meant, and never made any attempt to contact Affiliated FM's underwriting department to determine how it defined earth movement. Filing 129, p. 22.

    In the cited record, Anderson testified that he did not contact underwriting or refer to its definition of earth movement. He also testified concerning his understanding of what earth movement meant; a

32

definition that differs from the plaintiff's.  Filing
133-3, ex. S (Anderson deposition), at CM/ECF p. 10,
17.  Based on the evidence submitted by the plaintiff,
Affiliated FM's underwriting department defined "earth
movement" as follows:

> Earth Movement means loss or damage caused by
> or resulting from any natural or man-made
> earth movement including but not limited to
> earthquake, landslide, mudflow, subsidence,
> and earth sinking, rising or shifting that
> results from[,] contributes to, or is
> aggravated by any of the above regardless of
> any other cause or event contributing
> concurrently or in any other sequence to the
> loss.

Filing 163-2, ex. F (underwriting "Earth Movement"
definition, at CM/ECF p. 27.  The evidence of record
indicates KAAPA was not charged a premium for the earth
movement endorsement because the defendant's
underwriting department concluded there was very
limited exposure; Nebraska was in a "non-earthquake
zone."  Filing 160-2, ex. VV (Mackin deposition), at
CM/ECF p. 4.

•  Affiliated FM did not consider the soil conditions
   underneath the fermentation tanks as a factor that may have
   impacted coverage for KAAPA's first claim, and did not
   investigate whether the change in water tables or moisture
   content of the soil contributed to the damage to KAAPA's
   fermentation tanks.  Filing 129, p. 23.

   In the cited record, Anderson testified that he did not
   review a soil profile diagram for the facility on
   plaintiff's first claim.  He also testified that he and
   Van Sickle reviewed Beckman's geotechnical report,
   which did discuss the soil conditions under the tanks
   and the effect of moisture in exacerbating soil
   settlement.  Filing 133-3, ex. S (Anderson deposition),
   at CM/ECF pp. 7, 16; filing 125-4, ex. M (Beckman
   Geotechnical report), at CM/ECF p. 41.

- "Collapse" was not defined in the policy, neither Anderson nor Michael Hagen, Chief Adjustor of KAAPA's first claim, attempted to ascertain how "collapse" is defined by the Nebraska courts or the insurance industry in general before denying coverage, and Hagen did not track legal decisions on policy interpretation in those jurisdictions where Affiliated FM's policies are sold.  Filing 129, p. 23.

    In the record cited, Anderson and Hagen provide testimony concerning their own understanding of what "collapse" means, state they believed KAAPA's tanks had not "collapsed," and admit they did not seek a legal determination before denying coverage on plaintiff's first claim.  Filing 133-3, ex. S (Anderson deposition), at CM/ECF pp. 11-12; filing 133-4, ex. T (Hagen deposition), at CM/ECF pp. 5-6.

- Neither Affiliated FM nor its engineering consultant reached any conclusion as to whether KAAPA's fermentation tanks were structurally impaired, or even in immediate danger of falling over.  Filing 129, p. 23.

    In the record cited, Anderson states he considered whether the tanks were so unstable as to pose a risk of tipping, but he did not reach a conclusion on that issue.  He believed no "collapse" had occurred because the tanks had not fallen down.  Anderson testified that he does not know whether and to what degree Van Sickle analyzed whether the tanks posed a risk of collapse; Hagen testified that he is not aware that Van Sickle performed such an investigation.  Filing 133-3, ex. S (Anderson deposition), at CM/ECF pp. 10-12; filing 133-4, ex. T (Hagen deposition), at CM/ECF pp. 5-6.

- Affiliated FM denied plaintiff's claims without contacting any of the contractors or engineers who were involved with the construction of the ethanol facility or the fermentation tanks.  Filing 129, p. 24.

34

In the cited record, Anderson testified that he did not
speak with Fagen, Mid-State, or Ostgren, but he does
not know if Van Sickle or anyone else acting on the
defendant's behalf spoke with Fagen.  Filing 133-3, ex.
S (Anderson deposition), at CM/ECF p. 13.

Affiliated FM further responds that any such efforts
would have been futile.  When KAAPA requested the
drawings for the tanks "as-built" from WINBCO on
January 27, 2006, WINBCO refused to provide them,
stating the drawings were owned by Fagen and WINBCO, as
Fagen's subcontractor, would provide them only to
Fagen.  After repeated requests from KAAPA, Fagen
provided KAAPA with AutoCAD construction drawings, but
not the "as-built" drawings.  Filing 166-2, ex. EEEE
(Gerhart deposition), at CM/ECF pp. 3-4.  In addition,
as of January 2, 2008, Fagen had failed to produce
documents related to the construction of the Minden
plant in response to subpoenas for such records
despite a court order requiring Fagen's production.
Filing 166-2, ex. FFFF (memorandum of law), CM/ECF pp.
7-8, 10, 16.

- Affiliated FM did not determine why Fagen used onsite soil
  rather than granular fill, nor discuss grading and drainage
  issues with its consultant.  Filing 129, p. 24.

  In the cited record, Anderson testifies that he and Van
  Sickle wondered why onsite soil was used, but Anderson
  did not ask Fagen this question, and he does not know
  if Van Sickle did.  Eukel had written that coverage may
  be available because when the tank floors were drilled
  for grouting, water came up through the holes in the
  beerwell tank floor.  Anderson testified that he and
  Van Sickle wondered about the grading and drainage at
  the site, but they did not get specific answers, and
  Anderson did not discuss this issue in detail with
  Eukel.  Filing 133-3, ex. S (Anderson deposition), at
  CM/ECF p. 20.

- Affiliated FM spoke to only Chuck Woodside, Shana Dahlgren,
  and Kevin Eukel, and gathered only photographs, Olsson

Associates' geotechnical report, and Mid-State's report in
performing its investigation.  Neither Anderson nor Van
Sickle spoke with Beckman regarding Olsson's geotechnical
report.  Filing 129, p. 24.

> In the cited record, Anderson testified that he visited
> the Minden plant site and considered his observations
> and all the information provided, including the sources
> specifically named in plaintiff's brief, before
> reaching a coverage decision.  He did not speak with
> Beckman, and does not know if Van Sickle did.  Filing
> 133-3, ex. S (Anderson deposition), at CM/ECF pp. 7,
> 21.

• Affiliated FM admitted that the soil conditions underneath
  KAAPA's Tanks were pertinent to understanding KAAPA's second
  claim submitted in 2005, but Anderson could not articulate
  why the soil conditions were not relevant to the
  investigation of KAAPA's first notice.  Filing 129, p. 16.

> In the cited record, Anderson testified that he did not
> obtain a diagramed soil profile of the Minden plant
> site to assess KAAPA's first claim, but did so on the
> second claim because Affiliated FM did not know what
> the second claim was about at the outset:  "The second
> claim was a mystery to us because nobody was
> cooperating or providing information to help us
> determine what was going on."  Filing 133-3, ex. S
> (Anderson deposition), at CM/ECF p. 16.

In contrast to the foregoing bad faith allegations raised by
KAAPA, the undisputed facts establish that Affiliated FM's
coverage decision on KAAPA's first claim was based on the
findings set forth in the November 12, 2004 report of KAAPA's
geotechnical expert, Ryan Beckman.  Beckman's report stated that
the settling of the fermentation and beerwell tank foundations
was caused by the failure of the contractors to use the

recommended fill material in the soils raft/geogrid.  The report
explained:

> Since the reinforced zone did not consist of a
> permeable crushed aggregate meeting the
> manufactur[er's] recommendations, the Tensar BX 1100
> geogrid was no longer able to perform as designed, . .
> . [and] the entire load of all the tanks [w]as no
> longer being transferred across the entire grid.

Filing 125-4, ex. M (Beckman Geotechnical report), at CM/ECF p.
44.  Beckman explained:

> Although surface runoff and the gradual transfer of
> moisture from the surrounding soils have expedited the
> settlement process, the severity of the settlement
> situation would likely not have exceeded the original
> design estimates stated in the Mid-State geotechnical
> report had the crushed aggregate meeting the
> manufacturer's recommendation been implemented.

Filing 125-4, ex. M (Beckman Geotechnical report), at CM/ECF p.
44; filing 163-2, ex. A (Beckman depostion), at CM/ECF p. 5.

     In addition, Beckman concluded that "the material near the
base of the excavation was relatively high in moisture content at
the time of construction and was likely unsuitable as structural
fill without the implementation of drying operations." Filing
125-4, ex. M (Beckman Geotechnical report), at CM/ECF p. 40.
However, one-half to as much as an inch of the beerwell and
fermentation tank settlement could have potentially occurred as a
result of the fifteen- to sixteen-foot drop in the ground water
elevation that occurred in that vicinity between April 2002 and
March 2006.  Filing 132-2, ex. P (Beckman letter), at CM/ECF pp.
27, 29.

Regarding the tank floors, Beckman's report of November 12, 2004 likewise concluded that the use of onsite soil to infill the ring wall provided insufficient support resulting in damage.

> Although no information is available regarding the condition of the soils directly below the floor of each tank, it was visibly noted that additional consolidation has occurred within the unreinforced compacted silty lean clay located directly below the floor of the tank and within the area of the ring wall. . . . [A]dditional consolidation is occurring within the compacted backfill located within the ring wall. Settlement around the perimeter of the ring wall has created voids and gaps between the top of the ring wall and the metal tank. These gaps and voids have allowed rainfall to seep into the compacted fill located within the ring wall. The infiltration of the rainfall has reduced the shear strength of the compacted fill soils resulting in additional consolidation. Since the shear strength of the silty lean clay within the reinforced zones have gradually weakened and it appears the tanks are no longer transferring the load across the entire geogrid, the load stresses below the tanks are the highest at the center of each tank. Since this area within the ring wall of each tank was installed with onsite silty lean clay instead of the more permeable granular compacted fill as shown on the design plans, this area is also undergoing additional consolidation.

Filing 125-4, ex. M (Beckman Geotechnical report), at CM/ECF p. 45.

Substantially the same causation opinion was reached in December 2005 by Ellickson, (the Karges-Faulconbrige engineer who investigated the damage to KAAPA's thin stillage tank), (filing 125-7, ex. JJ (Woodside email-12/15/2005), at CM/ECF p. 9), and by Affiliated FM's geotechnical expert, Ninyo & Moore. Ninyo & Moore performed site visits at the Minden plant on February 17, 2006 and February 6, 2007. The Ninyo & Moore report, dated December 13, 2007, states:

Based on the results of our evaluation, the contact
pressure on the tank floor from the tank loading caused
consolidation type settlement of the clayey infill and
unreinforced fill layers resulting in differential
settlement of the tank floor.  Review of the project
data also indicated that the center of the tank
floor settled significantly more with respect to the
perimeter of the tank resulting in the inward rotation
of the anchor bolts. The details presented on the
construction plans for the Beerwell tank indicated that
the infill material was to consist of compacted
granular material rather than the clayey soil utilized
during original construction.

. . .


Based on our review of construction records and the
results of our exploratory borings and test pit, the
material utilized for the geogrid-reinforced fill
consisted of silty clay.  The use of the clayey fill
between the geogrid layers reduced the effectiveness of
the geogrid, thereby contributing to the differential
settlement of the large tanks.  In order for the
geogrid to be effective, sufficient friction needs to
be developed at the soil-geogrid interface.  The use of
clayey soil reduces the soil-geogrid interaction
coefficient, thereby reducing the bearing capacity of
the geogrid reinforced soil mass.

Filng 125-8, ex. NN (Ninyo & Moore report), at CM/ECF pp. 13-14.


LEGAL DISCUSSION


A federal court's interpretation of an insurance policy in a
diversity case is governed by state law.  Allstate Ins. Co. v.
Burrough, 120 F.3d 834, 838 (8th Cir. 1997).  The parties agree
that Nebraska law governs this policy dispute over insurance
coverage for damages to KAAPA's ethanol plant in Minden,

Nebraska.[6]  See also, Fireman's Fund v. Structural Systems
Technology, Inc., 426 F. Supp. 2d 1009, 1023 (D. Neb.
2006)(Bataillon, J.)(applying Nebraska choice of law rules and
holding a contract dispute over fire, surety or casualty
insurance is determined under the law of the state where the
insured property is located).

        The parties' motions require interpretation of the insurance
policy issued by Affiliated FM to KAAPA.  Under Nebraska law:

        An insurance policy is a contract between an insurance
        company and an insured, and as such, the insurance
        company has the right to limit its liability by
        including limitations in the policy definitions.  If
        the definitions in the policy are clearly stated and
        unambiguous, the insurance company is entitled to have
        such terms enforced.

Fokken v. Steichen, 274 Neb. 743, 751, 744 N.W.2d 34, 40-41
(2008).  When the terms of the contract are clear, a court cannot
resort to rules of construction, and "the terms are to be
accorded their plain and ordinary meaning as the ordinary or
reasonable person would understand them."  Katherine R. Napleton
Revocable Self-Declaration of Trust v. Vatterott Educational
Centers, Inc., 275 Neb. 182, 188, 745 N.W.2d 325, 330 (2008).
See also, Midwest Neurosurgery, P.C. v. State Farm Insurance
Companies, 268 Neb. 642, 651, 686 N.W.2d 572, 579 (2004); Reisig
v. Allstate Ins. Co., 264 Neb. 74, 645 N.W.2d 544 (2002).

_____

        [6]That said, as evidenced by the following discussion,
Nebraska law provides guidance on the rules of construction for
interpreting contract terms, but there is very little Nebraska
law interpreting the specific contract provisions applicable to
this case.  Therefore the law of other jurisdictions is cited and
relied upon to resolve the parties' motions, provided those
rulings are consistent with the Nebraska rules of construction.

"A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." Lexington Ins. Co. v. Entrex Communication Services, Inc., 275 Neb. 702, 713, 749 N.W.2d 124, 132 (2008). However, the provisions and words within a policy must be read in context when assessing whether an ambiguity exists. "Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses." Gies v. City of Gering, 13 Neb. App. 424, 434, 695 N.W.2d 180, 189 (2005).

A contract must receive a reasonable construction. It must be interpreted as a whole and to give effect, if possible, to every part of the contract. Lexington Ins. Co., 275 Neb. at 713, 749 N.W.2d at 132. The language of an insurance policy should be read to avoid ambiguities, not tortured to create them. Fokken, 274 Neb. at 751, 744 N.W.2d at 41.

The fact that parties to a document or the courts have differing interpretations of the document does not necessarily compel the conclusion that the document is ambiguous. Tighe v. Combined Ins. Co. of America, 261 Neb. 993, 628 N.W.2d 670 (2001); Gies, 13 Neb. App. at 438, 695 N.W.2d at 192 (stating a split in decisional authority as to the meaning of a common policy provision does not compel a finding of ambiguity). "Regarding words in an insurance policy, the language should be considered not in accordance with what the insurer intended the words to mean but according to what a reasonable person in the position of the insured would have understood them to mean." Guerrier v. Mid-Century Ins. Co., 266 Neb. 150, 153-154, 663 N.W.2d 131, 135 (2003). If, upon review, the court finds an

41

ambiguity exists concerning the meaning of language in an insurance policy, the contract must be construed against the party preparing it.  Lexington Ins., 275 Neb. at 713, 749 N.W.2d at 132.

The policy issued to KAAPA by Affiliated FM is an "all-risk policy," meaning all risks are covered unless specifically excluded under the terms of the contract.  Poulton v. State Farm Fire and Cas. Co., 267 Neb. 569, 574, 675 N.W.2d 665, 670 (2004)(citing 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 101:7 at 101-17 (1997)).  The burden of proving the right to coverage under an insurance policy is on the insured.  Pogge v. American Family Mut. Ins. Co., 272 Neb. 554, 563, 723 N.W.2d 334, 341 (2006).  However, the insurer bears the burden of proving that an exclusionary clause in a policy precludes coverage.  Fokken, 274 Neb. at 752, 744 N.W.2d at 41.

A.   Affiliated FM's Arguments:  The Policy Exclusions.

Affiliated FM claims KAAPA is not entitled to coverage for damage to its tanks because those damages, and any resulting repair costs and business interruption losses, were directly caused by:  1) a latent defect; 2) faulty workmanship or construction; and/or 3) settling that did not result in collapse.  Filing 126, pp. 1, 19-30.  These perils are listed as "Group II" exclusions under the policy.  Filing 125-3, ex. F (policy), at CM/ECF p. 37-38.

1.   Latent Defect.

Affiliated FM argues that "improper preparation of the sub-grade soil" led to differential settlement of the ring wall

42

footings, (filing 126, pp. 24-25), and since the soil composition
below the tanks was hidden or concealed and could not be seen
during a reasonable and customary inspection, (filing 165, p.
12), the damages to KAAPA's tank were caused by a latent defect.
Subject to the policy's resulting or ensuing loss clause,
(discussed below), the Affiliated FM policy does not insure
against loss or damage caused by latent defects.  Filing 125-3,
ex. F (policy), at CM/ECF p. 37, Group II, ¶ 1.

      "A defect is said to be latent when it cannot be discovered
by a person of competent skill using ordinary care." Gibbar v.
Calvert Fire Ins. Co., 623 F.2d 41, 44 (8th Cir. 1980)
(interpreting Missouri law).  "[D]efects in construction may
constitute inherent or latent defects if the problems thus
created are not readily discoverable." Tzung v. State Farm Fire
and Cas. Co., 873 F.2d 1338, 1342 (9th Cir. 1989)(holding a
"latent defect" exclusion clause applied where the cause of the
insured's damage was soil expansion beneath a building due to
sub-surface water, and all evidence of these defects was imbedded
in the ground).  See also, Merz v. Allstate Ins. Co., 677 F.
Supp. 388, 389-90 (W.D.Pa. 1988)(holding that where the condition
of the foundation, presence or absence of reinforcement, and
nature of the backfill cannot be seen because they are concealed
by the ground, a policy's exclusion for latent defects compelled
a judgment for the insurer); Nida v. State Farm Fire & Cas. Co.,
454 So. 2d 328, 335 (La. App. 3d Cir. 1984)(finding that a home
foundation that "was not constructed to withstand th[e] movement
of the earth which occurs in this area" was a latent defect).

      However, as applied to the soil conditions underlying the
tanks at the Minden plant, some of the evidence of this soil
instability was not buried under the tanks.  Tank elevations were

43

measured in November 2003 when the tanks were initially filled, and could be monitored as needed to assess the degree of settlement over time.  See filing 125-4, ex. M (Beckman Geotechnical report), at CM/ECF p. 42.  The tanks were equipped with level transmitters, which served to signal when the tanks were settling, potentially before that settling was visible to the naked eye.  Filing 125-7, ex. II (KAAPA timeline), at CM/ECF p. 4; filing 130-7, ex. E (Gerhart deposition), at CM/ECF pp. 8-10.  There is no evidence of when the tank elevations changed or when the level transmitters first indicated differential settlement of the tanks.  In addition, the movement of KAAPA's tanks caused visible spalling of concrete and bent anchor bolts.  Ten days after the Affiliated FM policy was issued, KAAPA observed that fermentation tank three had "pulled in," and the "lip" of the tank's base was no longer sitting on its ring wall.  These visible defects provided notice that the ground underlying the tanks was unstable or, at the very least, that further inspection was warranted.  Under such circumstances, "a 'reasonable inspection' for purposes of the latent or inherent defect exclusion may . . . include appropriate expert assistance or analysis."  Chadwick v. Fire Ins. Exchange, 17 Cal. App. 4th 1112, 1126, 21 Cal. Rptr. 2d 871, 880 (Cal. App. 1st Dist. 1993).  There is no evidence of when the bent anchor bolts and spalled foundation defects were first visible.  There is no evidence in the summary judgment record that anyone, including Affiliated FM, inspected the condition of the tanks immediately before the policy went into effect; and if such inspections were made, what was observed.  There were methods through which the settlement of the tanks could be reasonably monitored, most notably monitoring tank elevation and level transmitter recordings.

44

The defendant has failed to produce evidence that the
"defective" soil condition under the tanks was undiscoverable
prior to issuance of the policy upon reasonable inspection.  See,
Neri v. Nationwide Mut. Fire Ins. Co., 719 A.2d 1150, 1154 (R.I.
1998)("[T]he key issues at trial should have been: (1) whether
the allegedly defective design was reasonably discoverable, and
(2) if so, whether the defendant in fact performed a reasonable
inspection of the premises.").  There is a "triable issue of fact
as to whether a reasonable expert inspection, undertaken at the
time the policy issued, would have revealed the defects causing
[KAAPA's] loss and, hence, as to whether the defects came within
the exclusion for latent defect or inherent vice."  Chadwick, 17
Cal. App. 4th at 1126, 21 Cal. Rptr. 2d at 880.  Accordingly,
Affiliated FM's motion for summary judgment based on the latent
defect exclusion should be denied.

    2.   Faulty Workmanship or Construction.

    Affiliated FM claims the damage to KAAPA's tanks was caused
by improper and inadequate workmanship, construction, and design,
in that the contractor used improper material in the foundation
systems which, in turn, led to differential settlement of the
tank foundations and floors.  Filing 126, p. 19.  The Affiliated
FM policy excludes coverage for loss or damage caused by "faulty
workmanship, faulty construction or faulty design."  Filing 125-
3, ex. F (policy), at CM/ECF p. 37, Group II, ¶ 2.

    Building on soil with "insufficient weight-bearing qualities
to sustain the weight placed thereon" is "faulty construction."
Dargue v. Chaput, 166 Neb. 69, 82, 88 N.W.2d 148, 157 (1958).
See also, El Rincon Supportive Services Organization, Inc. v.
First Nonprofit Mut. Ins. Co., 346 Ill.App.3d 96, 104, 803 N.E.2d

532, 538 (Ill. App. 1st Dist. 2004)(interpreting an insurance
policy and holding the plain, ordinary meaning of "construction"
encompasses excavation activities including laying the
foundation).  KAAPA raises no argument to the contrary.

On the record before the court, as between the parties in
this case, the evidence is undisputed that the soil under KAAPA'a
tanks lacked sufficient stability to provide a firm foundation
for the tanks constructed at the Minden plant.  The soil was
found to lack sufficient weight-bearing capacity before
excavation began, and it still lacked such capacity after the
contractor took measures to stabilize the ground.  However, those
measures were improperly performed; the geogrid was not installed
in accordance with the manufacturer's recommendations and the
ring walls were not filled in accordance with the specifications
on the engineering diagrams.  Specifically, onsite soil rather
than "compacted granular fill" was used to construct the soils
rafts and infill the ring walls.  Over time, and after the plant
became operational and the tanks were filled, the contractor's
use of onsite soil as infill proved insufficient to create the
weight-bearing capacity needed for KAAPA's tanks or the
foundation necessary for the floors of those tanks.  As a result,
differential settlement occurred.

In short, Fagen performed faulty construction in building
the tanks at the Minden plant.  Subject to the applicable
resulting or ensuing loss clause, (discussed below), the loss or
damage caused by this faulty construction is not covered under
the Affiliated FM policy.

3.    Settling.

The Affiliated FM policy does not insure against loss or
damage caused by settling of foundations, walls, or floors,
unless the structure or a material part thereof "collapses."
Filing 125-3, ex. F (policy), at CM/ECF p. 38, Group II, ¶ 7.
The evidence is undisputed that the foundations, walls, and
floors of KAAPA's tanks "settled" and, as a result, the tanks
were damaged.  The question is whether they "settled" as that
term is used under the policy.

The word "settling" is not defined in the policy.  In the
absence of a policy definition, "'[s]ettling' has generally been
taken to mean a gradual, natural process that every building
endures.  When the settling occurs from an accidental cause and
happens abruptly and unexpectedly, that is not the sort of
'settling' to which the policy language refers."  Winters v.
Charter Oak Fire Ins. Co., 4 F. Supp. 2d 1288, 1295 (D.N.M.
1998)(collecting cases).  Settlement exclusions are interpreted
to preclude coverage for damage caused by gradual settlement,
even if that settlement is sustained over a substantial period of
time, and the degree of settlement is serious due to the soil's
composition and susceptibility to compression.  Boston Co. Real
Estate Counsel, Inc. v. Home Ins. Co., Inc., 887 F. Supp. 369,
373 (D. Mass. 1995); Nida, 454 So. 2d at 330-36)(holding
differential settlement due to shrinkage and expansion of clay
soil was settlement, not collapse).

The evidence establishes that between November 2004 and
September 2005, the soil beneath KAAPA's beerwell and
fermentation tanks became unevenly compacted, resulting in what
witnesses and experts referred to as settlement or differential

47

settlement.  The record discloses when the damage was first
noticed, but there is no evidence indicating how often or when
the tanks were inspected prior to discovering this damage or
when, prior to finding the damage, they were last found to be
level, plumb, and in good condition.  In others words, there is
no evidence that the tanks suddenly moved, thus indicating an
abrupt or precipitous movement of the underlying soil.  The
evidence indicates the differential settlement process occurred
over the ten-month period, albeit perhaps more quickly during wet
weather.

     Based on the undisputed facts, KAAPA's tanks gradually
settled.  "Settling," as that term is interpreted in all-risk
insurance policies, occurred.  Based on the language of the
policy's settlement exclusion, if the tanks did not "collapse,"
KAAPA's property losses directly caused by this settling are not
covered.

     B.   KAAPA's Arguments:  Collapse, Earth Movement, and the
          Ensuing Loss Clause.

     In support of its claim for coverage, KAAPA argues:

     1.   The Minden plant tanks "collapsed"--a covered peril
          under the policy, even when that collapse is the result
          of "settling;"

     2.   The damages to its tanks were caused by "earth
          movement" in the form of "subsidence," a covered peril
          under the policy as endorsed; and

     3.   Even if "faulty construction" or a "latent defect"
          caused "settling," the losses KAAPA sustained were
          directly caused by the two previously described covered
          perils--collapse and earth movement--and therefore
          coverage is available under the resulting or ensuing
          loss provision of the policy's Group II exclusions.

48

In the interest of providing clarity, these arguments will
be addressed in reverse order.

1.    The Ensuing Loss Clause.

The listing of Group II exclusions in the Affiliated FM
policy is prefaced by the following sentence:

> This policy does not insure against loss or damage
> caused by the following perils; however, if loss or
> damage not excluded results, then that resulting loss
> or damage is covered.

Filing 125-3, ex. F (policy), at CM/ECF p. 37.  The second clause
of the foregoing provision is commonly, and will hereinafter be
referred to as an "ensuing loss clause."

Coverage is available under the Affiliated FM all-risks
policy for direct losses not excluded from coverage.  Filing 125-
3, ex. F (policy), at CM/ECF p. 25.  If the policy fails to state
that a peril is not covered, the peril is "not excluded," and can
be correctly referred to and re-named as "a covered peril."  By
substitution, the ensuing loss clause therefore states that "if
loss or damage [from a covered peril] results [from an uncovered
peril], then that resulting loss or damage is covered."
Incorporating the exclusions raised by Affiliated FM in this
case, and the covered perils identified by KAAPA in support of
its claim for coverage, into the ensuing loss clause, the clause
reads:

> [The Affiliated FM] policy does not insure against loss
> or damage caused by [settling that does not result in
> collapse, faulty construction, or latent defect];
> however, if loss or damage [from a covered peril]
> results [from an uncovered peril], then that resulting
> loss or damage is covered.

49

Filing 125-3, ex. F (policy), at CM/ECF p. 37.  Although the
structure of the policy's ensuing loss clause is difficult to
follow, considering the policy language in its entirety, the
clause is not ambiguous.  See Gies, 13 Neb. App. at 434, 695
N.W.2d at 189, petition for further review overruled, (June 15,
2005)(finding that ensuing loss provision of a policy's power
failure exclusion was not ambiguous where the clause qualified
the exclusion by stating:  "But if failure of power or other
utility service results in a Covered Cause of Loss, we will pay
for the loss or damage caused by that Covered Cause of Loss.").
See also, Schloss v. Cincinnati Ins. Co., 54 F. Supp. 2d 1090,
1094 (M.D. Ala. 1999)(holding a policy exclusion stating loss
caused by "rot" is not covered, but "any ensuing loss not
excluded is covered," is not ambiguous).   Schloss held:

> Reasonably interpreted, . . . the ensuing loss clause
> means that if a specified uncovered loss occurs, . . .
> then a separate loss which follows as a result of the
> specified, uncovered loss which would otherwise be
> covered remains covered.

Schloss, 54 F. Supp. 2d at 1094-95.


     Affiliated FM has proved faulty construction and settling,
and may also prove latent defect at trial.  Affiliated FM argues
that these exclusions directly caused the damage to KAAPA's tanks
and therefore KAAPA is not entitled to coverage for losses
arising from its damaged tanks.  Filing 126, p. 26.  Relying on
Acme Galvanizing Co. v. Fireman's Fund Ins. Co., 221 Cal. App. 3d
170, 179-80 (Cal. App. 1. Dist. 1990), Affiliated FM argues that
the ensuing loss clause is applicable only if a separate and
independent peril causes loss distinguishable from the preceding
excluded peril.  Filing 126, p. 30.  In Acme Galvanizing, a steel

kettle used to prepare molten zinc had a latent, defective weld. The welded seam failed, the kettle ruptured, and molten zinc spilled on the surrounding equipment in the insured's plant. Under these facts, Acme Galvanizing held that the defective weld and kettle rupture were not covered because losses caused by "latent defects" were excluded from coverage under the policy, and since no additional hazard occurred thereafter to cause the spillage, the molten zinc spill was directly caused by these excluded perils.  Acme Galvanizing held:

> We interpret the ensuing loss provision to apply to the situation where there is a "peril," i.e., a hazard or occurrence which causes a loss or injury, separate and independent but resulting from the original excluded peril, and this new peril is not an excluded one, from which loss ensues.

Acme Galvanizing, 221 Cal. App. 3d at 179-80.  The sentence immediately after this quote provides an example to explain Acme Galvanizing's "separate and independent" peril rule.  This sentence cites Murray v. State Farm Fire & Casualty Co., 219 Cal. App. 3d 58 (Cal. App. 4th Dist. 1990), and states that "in Murray, the initial excluded peril was the corrosion of the pipe and leakage of water, and the second resulting peril was the settling of soil." Acme Galvanizing, 221 Cal. App. 3d at 179-80.

Affiliated FM's argument concerning the meaning of the ensuing loss clause and its application to this case does not appear to follow the example set forth in Acme Galvanizing, the case it relies on.  Specifically, it appears that the Acme Galvanizing court would find faulty construction and any resulting soil settlement to be two separate and independent

perils--a finding that contradicts the thrust of Affiliated FM's argument.[7]

It is difficult to square Affiliated FM's interpretation of the ensuing loss clause with the language of the clause.  The Affiliated FM policy clause contains no language indicating that coverage under that clause is available only if a loss not excluded results from, but is nonetheless separate and independent from, an uncovered peril.  Rather, the language of the ensuing loss clause states that if one of the specified uncovered perils occurs, any resulting loss which is otherwise covered by the policy will remain covered, but the uncovered peril itself is never covered.  Brodkin v. State Farm Fire & Cas. Co., 217 Cal.App.3d 210, 265 Cal.Rptr. 710, 714 (1989).

Applying this reasoning, Smith v. Westfield Ins. Co., 2007 WL 1740816, 2 (E.D. Pa. 2007), explained that when an insured's loss falls within a policy's "faulty construction" exclusion, and that exclusion is subject to an ensuing loss clause, "losses that *are* faulty construction . . . are not covered, while 'ensuing losses,' or those that *result from* the faulty construction . . . are covered," provided the ensuing loss itself is not excluded elsewhere in the policy.  Westfield, 2007 WL 1740816 at *2 (emphasis in original).  In Westfield, the insureds sought recovery under a homeowners policy for damages caused by water infiltration into their home, a problem undisputedly caused by

---

[7]This statement should not be interpreted as accusing Affiliated FM or its counsel of misstating the cited case. Rather, it underscores the difficulty of clearly explaining, in written word, the subtle distinctions between direct cause, proximate cause, resulting loss or cause, ensuing loss or cause, etc., and how easy and likely it is to misinterpret what another court was trying to say.

faulty construction.  The court held that the policy's "faulty
construction" exclusion precluded the insureds from recovering
the cost of repairing the faulty construction--in that case,
replacing the stucco and windows.  However, the water leakage had
damaged the interior of the home, and to the extent those damages
were not separately excluded from recovery under the policy, the
insureds were entitled to recover the repair costs as losses
resulting from the faulty construction.  The Westfield opinion
provided the following simple example:

> The contractor did not properly install the stucco on
> the exterior of the house.  Due to this faulty
> construction, rainwater seeped into the house and
> damaged the flooring.  The insurance policy covers the
> cost of replacing the damaged flooring but not the
> stucco.

Westfield, 2007 WL 1740816 at *2.


     Similar reasoning was followed in American Concept, Ins. Co.
v. Jones, 935 F. Supp. 1220, 1229 (D. Utah 1996)(applying Utah
law).  In American Concept, coverage was sought under a
homeowners policy for cracks and settling of the interior walls
and concrete floor slabs in a home.  The insureds first noticed
the damage six months after the home was built, but within two
years, the walls and floors were settling and, according to the
insureds' expert, the structural integrity of the home was
substantially impaired.  The expert further concluded that the
house settlement was caused by a plumber's failure to fully
cement together the sewer line under the slab in the bathroom,
which allowed water to escape and eventually saturate the soil
under the home.  The insurer denied coverage based on policy
exclusions for losses caused by water seepage, settling, and
faulty construction.  However, these exclusions were subject to

53

an ensuing loss clause which stated that any ensuing losses not excluded or excepted in this policy were covered.  The insurer moved for summary judgment, arguing that the damage to the home was caused by the plumber's faulty workmanship.  The court in American Concept rejected this argument and held that although the damage to the pipe itself was excluded from coverage, if the homeowners were able to prove their home "collapsed," a covered peril, the losses caused by the collapse were covered.  American Concept, 935 F. Supp. at 1229-30.

In the absence of an ensuing loss clause, the faulty construction exclusion and perhaps the latent defect exclusion would foreclose KAAPA's claim for coverage under the policy.[8] Despite these policy exclusions, under the policy's ensuing loss clause, KAAPA may be able to recover under the policy if it proves at trial that the faulty construction (or latent defect) caused its tanks to "collapse" and/or "earth movement," both of which are covered perils.  However, the extent of KAAPA's coverage is limited to those losses directly caused by the collapse.

KAAPA should not be allowed to recover any losses for repairing the faulty construction itself.

2.   Earth Movement.

KAAPA claims that its tank damages were caused by "earth movement," a covered peril under the policy as modified by the

---

[8]Based on the language of the "settling" exclusion, that exclusion would also bar coverage unless KAAPA proves "collapse"–which is addressed later in this opinion.

54

"Earth Movement Endorsement."  Filing 129, p. 54.  The Affiliated
FM policy stated:

> This policy does not insure against loss or damage
> caused directly or indirectly by or resulting from . .
> . [a]ny natural or man-made earth movement, including
> but not limited to:
>
> > a. Earthquake;
> > b. Landslide,
> > c. Mudflow;
> > d. Earth sinking, earth rising or shifting; or
> > e. Subsidence;
>
> > Resulting from, contributed to or aggravated by any of
> > the above.  Loss by fire, explosion or sprinkler
> > leakage ensuing from any of the above is covered by
> > this policy.

Filing 125-3, ex. F (policy), at CM/ECF pp. 34, 36.[9]  This
exclusion was deleted "in its entirety" by the "Earth Movement
Endorsement," (filing 125-3, ex. F (policy), at CM/ECF p. 52),
and, accordingly, the perils encompassed within the policy's
earth movement exclusion became covered perils.  The plaintiff
argues its tanks were damaged by "subsidence," and therefore
coverage exists.  Affiliated FM argues that the tanks were
damaged by settling, and the subsidence provisions of the earth
movement endorsement are not applicable to this case.

Like "settling," neither "earth movement" nor "subsidence"
are defined in the policy.  KAAPA argues that "subsidence" refers
to both gradual or abrupt sinking of land.  In support of the
statement, it relies on several sources, including definitions
gleaned from a dictionary and the U.S. Geological Survey.  The
USGS defines land subsidence as "a gradual settling or sudden

_____

[9]This exclusion, though very ungrammatical, is correctly
quoted.

sinking of the Earth's surface owing to subsurface movement of earth materials."  See http://pubs.usgs.gov/circ/circ1182. KAAPA therefore argues that the differential settlement of its tanks, whether gradually or abruptly occurring, is subsidence and therefore covered under the policy.  Filing 129, p. 54.

"A contract must receive a reasonable construction, and [the court] must construe it as a whole and, if possible, give effect to every part of the contract."  Lexington Ins. Co., 275 Neb. at 713, 749 N.W.2d at 132.  The Affiliated FM policy identifies "settling" as a Group II exclusion subject to an ensuing loss clause; "earth movement is a Group I exclusion for which no such clause applies.  The court cannot interpret "subsidence" in the policy to include gradual settling or subsiding of the soil without rendering the settlement exclusion meaningless.  Jones v. St. Paul Ins. Co., 725 S.W.2d 291, 293 (Tex. App.-Corpus Christi 1986)(refusing to interpret "earth movement" to include "settling" where, by doing so, the "settling" exclusion would be rendered meaningless).

Further, the earth movement exclusion applies to any "natural or man-made earth movement," and thereafter lists earthquake, landslide, mudflow, earth sinking, earth rising or shifting, and subsidence.  Under the *ejusdem generis* canon of construction followed under Nebraska law, when a general word or phrase is followed by a list of specific things, the general word or phrase will be interpreted to include only those things of the same type as those listed.  Columbia Nat. Ins. v. Pacesetter Homes, Inc., 248 Neb. 1, 15, 532 N.W.2d 1, 9 (Neb. 1995).  With the possible exception of subsidence, all the examples of earth movement listed in the policy are abruptly occurring events.  "Most courts have confined the meaning of 'earth movement' to its commonplace usage-

56

-referring only to sudden, cataclysmic events." Boston Co. Real Estate, 887 F. Supp. at 374(denying earth movement coverage because the settlement of soil under a building is not an earth movement).

This court likewise finds that "subsidence," as that term is used in the Affiliated FM policy, refers to sudden or abrupt soil movements and does not include gradual soil compaction.  As previously explained, there is no evidence that the soil under KAAPA's tanks moved abuptly.  Affiliated FM's motion for summary judgment on KAAPA's claim for coverage under the earth movement endorsement should be granted, and KAAPA's cross-motion on this issue should be denied.

3.    Collapse.

KAAPA argues that its tanks "collapsed" within the meaning of the policy because they could not be used without risking a catastrophic tank rupture and the precipitous escape of hundreds of thousands of gallons of product.  Filing 129, p. 33-34.  KAAPA claims the tanks lost rigidity, support, and connection with other parts, necessitating emergency repairs to prevent the total failure of the tanks and to ensure the safety of KAAPA personnel. Filing 129, p. 36.  Affiliated FM argues KAAPA cannot prove the tanks "collapsed" because the damage to the tanks did not materially impair their basic structure or substantial integrity, (filing 159, p. 14), there was no imminent risk of collapse, and a mere "structural impairment" is insufficient to constitute a collapse.  Filing 159, p. 15.

There are at least two lines of cases concerning what constitutes a "collapse" for the purposes of an all-risk property

insurance policy.  One line of cases holds that collapse occurs
only if the building or structure actually falls down.  See e.g.,
Olmstead v. Lumbermens Mut. Ins. Co., 22 Ohio St. 2d 212, 216, 259
N.E.2d 123, 126 (1970)("[C]ollapse. . ., in its plain, common and
ordinary sense, means a falling down, falling together, or caving
into an unorganized mass."); Higgins v. Connecticut Fire Ins. Co.,
163 Colo. 292, 296, 430 P.2d 479, 481 (1967)(holding insured's
house did not "collapse" within the plain meaning of that word
where it did not fall in or lose its shape and it was not, in
whole or in part, reduced to a flattened form).

     A broader definition of "collapse" began with the holding in
Travelers Fire Ins. Co. v. Whaley, 272 F.2d 288, 291 (10th Cir.
1959)(interpreting Kansas law).  Whaley held that in the absence
of a definition of "collapse" within the policy, the term was
ambiguous and, in the context of a damaged house, should be
defined to include "a sinking, bulging, cracking, or pulling away
of a wall so as to impair its function of supporting the
superstructure and destroying its efficiency as a habitation."
The Kansas Supreme Court adopted the holding in Whaley in Jenkins
v. U. S. Fire Ins. Co., 185 Kan. 665, 670, 347 P.2d 417, 422
(1959).  Jenkins held:

          [T]he clause "collapse of building or any part thereof"
          as used in the involved insurance contract is to be
          interpreted as comprehending that, if brought about by
          unusual and extraordinary circumstances which the
          parties to that agreement could not normally expect or
          foresee on the date of its execution, the settling,
          falling, cracking, bulging or breaking of the insured
          building or any part thereof in such manner as to
          materially impair the basic structure or substantial
          integrity of the building is to be regarded as a
          "collapse" of the building within the meaning of that
          word as used in such clause of the policy. . . .
          [Q]uestions relating to whether that condition came
          about under the previously related conditions and

circumstances are questions of fact for the jury and the
trial court.

Jenkins, 185 Kan. at 671-672, 347 P.2d at 422-23.

Relying heavily on Whaley and Jenkins, the Nebraska Supreme
Court in Morton v Travelers Indem. Co., 171 Neb 433, 106 N.W.2d
710 (1960), held that the insured homeowners could recover for the
"collapse" of their basement walls where the walls were bulging in
and cracked, and it appeared a total collapse could happen any
minute.  Morton explained:

> [I]t cannot be reasonably assumed that a person
> purchasing insurance for his home, including coverage
> for direct loss by "collapse of the building or any part
> thereof" understood such phrase as providing coverage if
> and only if his home, or at least a part thereof, falls
> together in an irregular mass or flattened form.
> Otherwise, the homeowner would be purchasing little if
> any added protection.

Morton v. Travelers Indem. Co., 171 Neb. at 449, 106 N.W.2d at
720-21.  Morton did not actually state how the Nebraska Supreme
Court defines "collapse."  It recited the definition as set forth
in Jenkins and other cases, and concluded under the facts
presented, including the apparent likelihood that the basement
walls would collapse at any moment, a "collapse" occurred.

Some courts, while refusing to require a structure to fall
down for a "collapse" to occur, have rejected the "substantial
impairment of structural integrity" definition out of concern that
the policy would become, in essence, a maintenance agreement. See
e.g., Doheny West Homeowners' Ass'n v. American Guarantee &
Liability Ins. Co., 60 Cal. App. 4th 400, 406, 70 Cal. Rptr. 2d
260, 264 (Cal. App. 2d Dist. 1997)(collecting and extensively

discussing the modern case law).  Instead, these courts require a
showing of either actual or "imminent" collapse.  Id.

Applying this definition, Affiliated FM argues that KAAPA's
claim must be denied because it has failed to show the alleged
damages to the tanks created a risk of imminent collapse.  It
argues that KAAPA was not really concerned about the tanks and did
not perceive the risk of collapse as imminent, as evidenced by the
fact that it made no real or immediate repairs to the tanks, and
continued to use them.  Filing 159, p. 19-22

The holding in Jenkins still embodies the definition of
"collapse" followed by the majority of jurisdictions.  "[T]he
clear modern trend is to hold that collapse coverage provisions .
. . . which define collapse as not including cracking and settling
. . . provide coverage if there is substantial impairment of the
structural integrity of the building or any part of a building."
American Concept, 935 F. Supp. at 1227(collecting cases).  There
is no reason to believe the Nebraska Supreme Court, if faced with
the question again, would depart from this majority viewpoint and
require KAAPA to prove not only a substantial impairment of the
structural integrity of its tanks, but that due to this
impairment, collapse was "imminent."  See e.g.,Sandalwood
Condominium Ass's at Wildwood v. Allstate Ins. Co., 294 F. Supp.
2d 1315 (M.D. Fla. 2003)(holding that an insured who proves
substantial impairment of structural integrity need not also prove
imminent risk of collapse to recover the direct losses caused by
the "collapse.").

To varying degrees for each of the nine tanks at issue, KAAPA
has submitted evidence that the tanks were "tipping," the anchor
bolts were bent, the foundation walls were spalling, and a risk of

rupture existed.  A jury must decide the magnitude of damage
incurred and determine whether this evidence proves the tanks'
structural integrity was substantially impaired.  Guyther v.
Nationwide Mut. Fire Ins. Co., 109 N.C. App. 506, 514, 428 S.E.2d
238, 242 (1993).  The parties' cross-motions for summary judgment
on the issue of "collapse"  should be denied.

To summarize the findings on the coverage and exclusion
issues raised by the parties, the undersigned finds that the only
coverage which may be afforded KAAPA under the policy is coverage
for collapse, an issue that must be decided by the jury.
Affiliated FM has proved "faulty construction," an excluded peril,
and any damages for repairing the construction defects themselves
cannot be recovered by KAAPA under the policy.  However, to the
extent KAAPA proves its tanks "collapsed" during the term of its
policy with Affiliated FM, and the nature and extent of any losses
directly resulting from that "collapse," KAAPA is entitled to
coverage under the policy for those losses.

C.    Denial of Process Liquid Tank Claims as Beyond the
      Expiration of the Policy.

As a separate argument, Affiliated FM claims that even if
KAAPA is entitled to coverage for tank damages, that recovery must
be limited to the fermentation and beerwell tanks.  It claims any
damage to the process liquid tanks occurred after KAAPA cancelled
it policy with Affiliated FM.

The policy at issue sets limits of liability "per
occurrence."  Filing 125-3, ex. F (policy), at CM/ECF p. 20.  It
does not state whether an occurrence triggering liability happens
when the property is exposed to harm, when the harm becomes
manifested, throughout the time period from exposure through

manifestation, or when "injury-in-fact" occurs.  See Martin J.
McMahon, Annotation, "*Event Triggering Liability Insurance
Coverage as Occurring Within Period of Time Covered by Liability
Insurance Policy Where Injury or Damage is Delayed--Modern Cases,*
14 A.L.R.5th 695 (1993).

     Relying on California law, Affiliated FM argues that since
the damage was not "manifested" within the term of the policy,
there is no coverage for the alleged damage to KAAPA's process
liquid tanks under the policy.  See filing 126, p. 38 (citing
Prudential-LMI Com. Insurance v. Superior Court, 51 Cal.3d 674,
798 P.2d 1230 (1990) (holding "in first party progressive property
loss cases, when . . . the loss occurs over several policy periods
and is not discovered until several years after it commences, the
manifestation rule applies").  But see, Stonelight Tile, Inc. v.
California Ins. Guarantee Ass'n, 150 Cal. App. 4th 19, 36, 58 Cal.
Rptr. 3d 74, 87 (Cal. App. 6th Dist. 2007)(holding that in third
party insurance cases, "[w]here damages continue throughout
successive policy periods, . . . all insurance policies in effect
during those periods are triggered.  Coverage is not limited to
the policy in effect at the time of the precipitating event or
condition and is not cut off once the injury or damage begins or
becomes manifest.").  Affiliated FM argues, in essence, that the
plaintiff's right to coverage, if any, arises under the insurance
policy KAAPA obtained to replace its Affiliated FM policy.

     The Affiliated FM policy term began on August 22, 2004 and
continued until the policy was cancelled on November 14, 2005.
Affiliated FM has not referenced, and the court has not found, any
language in the policy supporting "manifestation" of injury as the
policy's triggering event.  There is evidence that damage to the
thin stillage tank, one of the five process liquid tanks, was not

62

known, or "manifested," until at least November 30, 2005.  See, filing 125-6, ex. Y (Gerhart deposition), at CM/ECF pp. 18-19; filing 125-7, ex. II (KAAPA timeline), at CM/ECF p. 4; filing 133-5, ex. W (proof of loss–9/26/2006), at CM/ECF p. 3.  However, there is also evidence that as of November 9, 2005, KAAPA had noticed the level transmitter on the thin stillage tank was "tipping," indicating the tank was settling and no longer plumb, (filing 130-7, ex. E (Gerhart deposition), at CM/ECF p. 10), and it decided to remove the tank's insulation to inspect the tank interior to evaluate the "extent" of damage.  Filing 125-7, ex. II (KAAPA timeline), at CM/ECF p. 4.  There is also evidence the thin stillage tank settled for the same reason, and was exhibiting the same type of damage, as the beerwell and fermentation tanks, and therefore KAAPA had reason to believe that if the thin stillage tank was damaged, all the process liquid tanks where damaged.  Accordingly, even if the court concludes "manifestation" is the triggering event for coverage under the policy, a fact issue exists as to whether the damage to the process liquid tanks was manifested before the policy was cancelled.  See e.g., Home Ins. Co. v. Landmark Ins. Co., 205 Cal. App. 3d 1388, 253 Cal. Rptr. 277 (Cal. App. 4 Dist. 1988)(holding presence of concrete spalling put reasonable person on notice of potential claim, and insurer at the time this notice occurred was liable for the entire claim).  Defendant's motion for summary judgment on this issue should therefore be denied.

More importantly, Nebraska has not adopted "manifestation" of injury as the triggering event for first party insurance claims, and would likely not do so under the factual circumstances presented in this case.  There is evidence supporting KAAPA's claim that the process liquid tanks were damaged during, and perhaps continuously throughout, the policy term due to ongoing

settlement of the unstable soil beneath the tanks.  "A recurring issue that arises in the context of determining which policies are triggered is ascertaining the date of injury/damage in a case involving continuing injury/damage that was latent for a period of time."  2 Insurance Claims and Disputes 5th § 11:4.

> The correct answer, and the rule in the vast majority of the courts to have addressed the issue, is that coverage is triggered from the date of the first latent injury/damage and continues to be triggered at least until the date the injury/damage first becomes manifest. Since coverage is triggered in the event of an injury/damage during the policy period, the foregoing rule merely comports with the express terms of the policy.  The same rule should be applied in interpreting similar policy language, whether the claim is for first party or third party coverage.
>
> . . .
>
> Accordingly, applying the foregoing rule, when there is an ongoing process of property damage or bodily injury, every policy period in effect during the ongoing damage/injury process provides coverage.  The burden should be on the insured to prove that there was, in fact, such injury/damage during the policy period.

2 Insurance Claims and Disputes 5th § 11:4 (see footnote 21, collecting cases).

The parties have not cited, and the court has not found any case law addressing whether Nebraska would follow the foregoing majority rule.  There is also no Nebraska case law adopting the "manifestation" trigger advocated by Affiliated FM absent policy language describing an occurrence as such.  Upon thorough review, the policy is nearly devoid of any language indicating (much less defining) what "occurrence" means.  It does state, however, that any legal action under the policy must be initiated within two years after the date "on which the direct physical loss or damage

64

first commenced or occurred." Filing 125-3, ex. F (policy), at
CM/ECF p. 41.  In the absence of any other policy language to
assist in interpreting when a peril "occurs" for the purposes of
this policy, the foregoing statement certainly implies that an
"occurrence" happens upon the commencement of physical loss or
damage, not its manifestation.  Filing 125-3, ex. F (policy), at
CM/ECF p. 41.

    In the context of third party insurance claims, the Nebraska
Supreme Court has held that an accident "occurs" and triggers
coverage when the complaining party is actually damaged. Farr v.
Designer Phosphate and Premix Intern., Inc., 253 Neb. 201, 570
N.W.2d 320 (1997).  The undersigned concludes that if faced with
the question, Nebraska would adhere to the "injury-in-fact"
trigger and hold that in first party property insurance cases,
coverage for property loss or damage that has progressed over time
occurs when the damage commenced, not merely when it was
discovered.  Although the parties are free to negotiate a
different definition of "occurrence," and the court cannot impose
its definition in the face of clear policy language to the
contrary, defining an occurrence under the Affiliated FM policy as
triggered by the commencement of physical loss or damage is
buttressed, not undermined, by the policy's language stating
lawsuits must be filed within two years after the damage or loss
began.  See e.g., Ellis Court Apartments Ltd. Partnership ex rel.
Woodside Corp. v. State Farm Fire and Cas. Co., 72 P.3d 1086
(Wash. App. Div. 1 2003)(rejecting the manifestation trigger
doctrine and holding that under the injury-in-fact trigger, a
building collapse occurred at the point in time when decay or rot
first caused substantial structural impairment, even if the policy
expired before the loss was discovered); Kief Farmers Co-op.
Elevator Co. v. Farmland Mut. Ins. Co., 534 N.W.2d 28 (N.D.

1995) (holding that where the policy covers "loss or damage
commencing . . . [d]uring the policy period," and in the absence
of language purporting to connect the commencement of property
loss to when the damage was discovered, coverage is triggered when
the property loss or damage begins).

KAAPA has met its burden of presenting evidence that the
damage to the process liquid tanks began during the policy term.
Affiliated FM may choose to respond that any actual damage to
these tanks occurred after the expiration of the policy.  Since
this issue of fact remains in dispute, Affiliated FM's motion for
summary judgment should be denied.

        D.   <u>Recovery of Damages under the Policy.</u>

If KAAPA proves collapse, it may recover only those losses
caused by the collapse.  It is not entitled to recover its costs
for repairing the underlying faulty construction, or any latent
defect Affiliated FM may prove at trial.  For example, KAAPA is
not entitled to recover the amounts paid to Denver Grouting for
grout compaction, or later paid to raise the tanks, remove the
tank floors, and replace the infill in the ring walls.  These
repairs costs were incurred to correct the "faulty construction,"
an uncovered peril under the policy.

KAAPA argues that it is entitled to recover these repair
costs because the costs were incurred to mitigate its losses.
KAAPA claims it is entitled to coverage pursuant to the policy
provision which states:

        [Affiliated FM] shall not be liable for loss by . . .
        perils insured against in this policy caused, directly
        or indirectly, by . . . [the] neglect of the insured to

use all reasonable means to save and preserve the
properly at and after a loss. . . .

Filing 125-3, ex. F (policy), at CM/ECF p. 19.  This "mitigation"
provision is not a grant of coverage.  Under its plain and
unambiguous language, this provision states Affiliated FM will not
pay for losses caused by a covered event that could have avoided
through reasonably means.  It does not grant coverage for the
insured's repair costs arising from an uncovered peril.
Specifically, the "mitigation" provision does not state KAAPA is
entitled to recover the amounts spent to repair the faulty
construction "at or after" it occurred because faulty construction
is not a "peril[] insured against in the policy."

    The parties have raised arguments concerning the correct
interpretation of the policy's "Protection and Preservation of
Property" clause.  Many of these arguments may be moot in light of
the foregoing coverage recommendations.  Nonetheless, the
Protection and Preservation of Property clause "covers the
reasonable and necessary costs incurred to temporarily protect or
preserve insured property . . . in order to avoid or prevent
immediately impending physical loss or damage from a peril insured
by this policy."  Filing 125-3, ex. F (policy), at CM/ECF p. 26.
Coverage under the clause is clearly limited to "temporary"
protective measures, and does not include, for example, the
compaction grouting performed by Denver Grouting.  Compaction
grouting was intended to be a permanent repair, and with respect
to the soil below the level of the ring wall footings, it met this
goal.

    Likewise, if KAAPA proves "collapse," it can recover its
business interruption losses resulting from the collapse, but not
those incurred to repair of the faulty construction of its tanks.

67

The business interruption endorsement limits the recovery of such losses to those "[r]esulting from direct physical loss or damage from perils insured by this policy." Filing 125-3, ex. F (policy), at CM/ECF p. 48.  See e.g GTE Corp. v. Allendale Mutual Ins. Co., 372 F.3d 598, 616 (3d Cir. 2004) (holding an insured cannot recover for ensuing or resulting business losses unless the underlying peril resulting in business interruption is covered); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Texpak Group N.V., 906 So. 2d 300, 302 (Fla. App. 3d Dist. 2005)("[B]usiness interruption and extra expense losses are covered only if 'resulting from' damage or destruction of real or personal property caused by a covered peril").  Therefore, to the extent KAAPA seeks recovery for business interruption losses caused by the compaction grouting performed in 2004, or the successful tank repairs performed in 2006, these losses cannot be recovered because they were directly caused by the faulty construction of the tanks and not the covered peril of "collapse."

     E.   Bad Faith.

     The plaintiff claims Affiliated FM's coverage denials "were based on a deliberate disregard for the appropriate interpretation of relevant Policy provisions, and a complete lack of evidence from the third-party contractors and engineers who constructed KAAPA's ethanol facility, including the Tanks." Filing 162, p. 34.  Affiliated FM has moved for summary judgment on plaintiff's bad faith claim, arguing that it had a reasonable basis for denying coverage.  Filing 126, p. 2, 44-46.

     To establish a claim for bad faith under Nebraska law, "a plaintiff must show an absence of a reasonable basis for denying the benefits of the insurance policy and the insurer's knowledge

68

or reckless disregard of the lack of a reasonable basis for
denying the claim." Radecki v. Mutual of Omaha Ins. Co., 255 Neb.
224, 583 N.W.2d 320 (1998). An insurance company has the right to
debate claims that are "fairly debatable," or subject to a
reasonable dispute, without being subject to a bad faith claim.
Williams v. Allstate Indem. Co., 266 Neb. 794, 799, 669 N.W.2d
455, 460 (2003). The court must determine, as a matter of law,
whether a insured's claim for coverage was subject to reasonable
dispute. The resolution of this threshold issue is based on the
information available to the insurance company at the time the
plaintiff's demand was presented. Williams, 266 Neb. at 799, 669
N.W.2d at 460.

Affiliated FM denied the plaintiff's first claim for coverage
on January 20, 2005. Filing 125-6, ex. EE (FM Affiliated claim
denial–1/20/2005), at CM/ECF p. 46-48. This determination was
based on the "reports and information provided" which indicated
that the tanks had been settling since the date they were put into
use because "inappropriate materials (soil) were used in the
foundation system." Filing 125-6, ex. EE (FM Affiliated claim
denial–1/20/2005), at CM/ECF p. 46.

As of the time this decision was made, an Affiliated FM
claims adjuster had inspected the facility with the assistance of
an engineer hired by Affiliated FM, (filing 133-3, ex. R (Van
Sickle memorandum–12/14/2004), at CM/ECF p. 2), and had received a
copy of the report prepared by KAAPA's geotechnical expert, Ryan
Beckman, and the pre-construction engineering report prepared by
Mid-State in June 2002. Filing 133-3, ex. R (Van Sickle
memorandum–12/14/2004), at CM/ECF pp. 2-3; ex. S (Anderson
deposition), at CM/ECF p. 22. The Mid-State report concluded the
land beneath the proposed tank site would likely not support the

69

weight of KAAPA's tanks, and recommended installing "a compacted
soils raft reinforced with Tensar grid, or equivalent." Filing
125-2, ex. C (6/20/2002 Mid-State report), at CM/ECF p. 34.  The
Beckman report stated that although Fagen built a soils raft, it
failed to build this raft in accordance with the manufacturer's
recommendations.  Specifically, the manufacturer recommended using
permeable crushed aggregate for fill between the grid layers, but
Fagen used onsite silty lean clay soil instead.  The Beckman
report stated that the contractor's use of onsite soil to create
the soils raft and to infill the interior of the ring wall caused
the fermentation and beerwell tank foundations and floors to
settle.  Filing 125-4, ex. M (Beckman Geotechnical report), at
CM/ECF p. 41.

     KAAPA's second claim for coverage also raised claims arising
from tank settlement.  Affiliated FM gathered some additional
information, but in the end, reached the same decision.  Filing
125-7, ex. MM (FM Affiliated claim denial-3/14/2007), at CM/ECF
pp. 23-24.

     Affiliated FM denied KAAPA's claims for coverage based on
policy exclusions for losses caused by faulty construction,
workmanship, and design; latent defect; and settling in the
absence of structural collapse.  As more extensively discussed in
the preceding sections of this report and recommendation, based on
the information it possessed when it denied KAAPA's claims,
Affiliated FM had a reasonable basis for determining that KAAPA's
losses were due to faulty construction and perhaps a latent
defect.  Although KAAPA claims Affiliated FM failed to research
and follow Nebraska law when assessing whether coverage was
nonetheless required due to tank "collapse," a reasonable debate

70

existed, and still exists, concerning whether the plaintiff's tanks "collapsed."

KAAPA's claims for coverage were "fairly debatable." Affiliated FM's motion for summary judgment on KAAPA's bad faith claim should be granted.

F.   Punitive Damages.

Citing Abel v. Conover, 176 Neb. 926, 104 N.W.2d 684 (1960), Affiliated FM seeks summary judgment on plaintiff's claim for punitive damages.   Filing 126, p. 2.   Abel held:

> It has been a fundamental rule of law in this state that punitive, vindictive, or exemplary damages will not be allowed, and that the measure of recovery in all civil cases is compensation for the injury sustained.

Abel, 170 Neb. at 929, 104 N.W.2d at 688.   "Since all penalties must go to the benefit of the common schools of the state, a penalty for the benefit of a private person" violates Article VII, section 5, of Nebraska Constitution.   Abel, 170 Neb. at 932, 104 N.W.2d at 689.

Citing State ex rel. Stenberg v. American Midlands, Inc., 244 Neb. 887, 509 N.W.2d 633 (1994), the plaintiff argues that punitive damages can be awarded against Affiliated FM if such damages are allocated to "the use and support of the common schools."   NE CONST Art. VII, § 5.   In Stenberg, the plaintiff, the State of Nebraska, obtained a judgment against a private defendant for violating the state's Consumer Protection Act. Pursuant to the terms of that statute, civil penalties were assessed against the defendant.   The defendant argued that these penalties violated the Nebraska Constitution.   Stenberg held that

"statutes providing for the assessment of civil penalties are not repugnant to the Nebraska Constitution" provided the penalties are not paid to a private person.  Stenberg, 244 Neb. at 893, 509 N.W.2d at 637.

KAAPA's amended complaint does not seek recovery under a statute, but under the common law.  The amended complaint prays for an award of punitive damages in favor of the plaintiff, not the "common schools."  Stenberg provides no support for KAAPA's punitive damage claim.

In addition, absent a showing of bad faith, KAAPA cannot recover punitive damages for Affiliated FM's alleged breach of contract.  Punitive damages are not awarded on common law claims for breach of contract.  Restatement (Second) of Contracts § 355 (collecting cases).  Ennen v. Public Service Mut. Ins. Co., 774 F.2d 321, 323 (8th Cir. 1985)(interpreting Iowa law); Lamb v. Amalgamated Labor Life Ins. Co., 602 F.2d 155, 159 (8th Cir. 1979)("Under Missouri law, punitive damages are not ordinarily allowable in a suit for breach of contract unless the breach was tortious in nature.").

KAAPA has failed to show Affiliated FM acted in bad faith by denying plaintiff's claims.  Even if KAAPA prevails on its breach of contract claim against Affiliated FM, KAAPA cannot recover punitive damages.  Affiliated FM's motion for summary judgment on plaintiff's claim for punitive damages should be granted.

G.   Attorney Fees.

KAAPA moves for summary judgment on its claim for attorney fees.  Filing 129, p. 55.  Neb. Rev. Stat. 44-359 states that in

72

all cases brought against an insurance company for coverage under a policy, "the court, upon rendering judgment against such company, . . . shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his or her recovery, to be taxed as part of the costs."

The plaintiff's motion for a judgment of attorney fees is premature.  The plaintiff did not seek summary judgment, but only partial summary judgment on the issue of liability.  Even if the plaintiff prevails on its motion, any judgment and accompanying attorney fee award cannot be awarded absent a trial verdict in favor of the plaintiff.  In addition, this report and recommendation recommends denial of the plaintiff's motion for partial summary judgment on the issue of liability.  Plaintiff's motion for summary judgment on the issue of attorney fees should be denied.

## EVIDENTIARY MOTIONS

The following evidentiary motions are pending:

- –   Defendant's motion challenging the admissibility of the opinions of plaintiff's expert witness, Donald Malecki. Filing 147.

- --   Plaintiff's motion challenging the admissibility of the testimony of defendant's expert, John Field, (filing 183).

- --   Plaintiff's motion to preclude the defendant from using information acquired after coverage was denied to defend against the plaintiff's bad faith claim, (filing 187).

- --   Plaintiff's motion to preclude the defendant from referring to or introducing evidence concerning faulty workmanship, faulty construction, or faulty design, (filing 192).

A.   <u>Defendant's Motion Challenging the Admissibility of
     Donald Malecki's Expert Opinions</u>.

The report of plaintiff's expert, Donald Malecki, states he
has been retained to provide the following opinions at trial.

- Affiliated FM Insurance Company did not meet its burden
  to show the applicability of any exclusion as is
  required when property insurance is written on an all-
  risks basis.

- Both the physical loss or damage and the consequential
  loss, as a result of earth movement are covered, in
  light of KAAPA's purchase of manmade earth movement
  coverage.

- The property exclusion dealing with settling, cracking,
  shrinkage, bulging of foundations, walls, floors, roofs,
  or ceilings is not applicable.  This exclusion is meant
  to apply to the nonfortuitous events that can occur over
  time.

- The Earth Movement Endorsement purchased by KAAPA covers
  both man-made and natural earth movement.  One of the
  perils included is subsidence, which, as normal
  dictionary definitions show, is defined to mean
  settling.

- The settling exclusion, furthermore, makes an exception
  for ensuing collapse loss.  Many insurers define
  "collapse," but Affiliated FM Insurance Company does
  not.  This ensuing loss provision applies to KAAPA's
  loss.

- The latent defect exclusion does not apply, because the
  exclusion only applies to covered property and the soil
  work is not covered property.  The ensuing loss
  provision of this exclusion, however, does apply.

- The faulty design and faulty workmanship exclusion
  likewise does not apply for the same reason the latent
  defect exclusion does not apply.  This exclusion also
  has an ensuing loss exception that applies here.

74

- The costs incurred by KAAPA to expedite [sic] its losses also are covered.

Filing 169-2, at CM/ECF p. 12-13.  In addition, Mr. Malecki is prepared to testify that Affiliated FM's claims adjuster failed to accurately interpret the policy in accordance with the foregoing opinions.  Instead, the letter denying coverage provided an inadequate explanation of why coverage was being denied, failed to explain with specificity why the policy exclusions cited supported denial of plaintiff's claim under the facts presented, and failed to mention all of the plaintiff's claimed damages.  Filing 169-2, at CM/ECF p. 14-15.  The report continues:

> [Affiliated FM] has some personnel whose egregious conduct does nothing but blemish the company's reputation.  What is doubly unfortunate is the fact that this is the second time I have been involved in a situation where an FM Group company has attempted to deny coverage for man-made earth movement on the basis of the policy's settlement exclusion.  One has to wonder, if it has been done twice, how often the insurers of the FM Global Group have denied valuable coverage in the past, even in those instances where man-made coverage has been purchased and in losses involving faulty soil work.

Filing 169-2, at CM/ECF p. 15.  The report further states that Affiliated FM cannot explain its conduct in this case by stating the claims adjuster was incompetent or inexperienced because it advertises the quality and excellence it provides on every claim. The report ends:

> What Mr. Anderson may need here is more guidance from [his] supervisor.  The idea of denying losses, and hoping the persistence of insureds looking for proper treatment of its insurers claims service, will go away, is no way to run a business.

75

> Based on the foregoing, it is my professional opinion, as someone who has spent his entire career in the insurance and risk management business in a variety of capacities, that the conduct of Affiliated FM Insurance Company, in this particular case involving KAAPA Ethanol, L.L.C. fell below industry standards and expectations.

Filing 169-2, at CM/ECF p. 15.

The opinions of Donald Makecki include:  1) opinions concerning the meaning and application of the Affiliated FM policy, and 2) the allegedly substandard conduct Affiliated FM in investigating and handling this KAAPA's claim.

Those opinions discussing whether Affiliated FM properly investigated and handled the plaintiff's claims are not relevant to KAAPA's breach of contract claim.  They are relevant, if at all, to KAAPA's alleged bad faith claim.  This report recommends granting the defendant's motion for summary judgment on the bad faith claim.

As to Malecki's opinions regarding the meaning and application of the Affiliated FM policy to KAAPA's claims, Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the <u>trier of fact</u> to understand the evidence or to determine <u>a fact</u> in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (emphasis added).

76

The interpretation of an insurance policy is a question of law.  Fokken, 274 Neb. at 750, 744 N.W.2d at 40.  Makecki's opinions concerning the meaning of policy terms do not assist the jury in deciding issues of fact.  Rather, they "are actually suggested legal interpretations of the Policy.  The Court is tasked with the duty to render legal opinions.  The proffered opinions thus invade the judicial function," and are inadmissible.  Bradley v. Phillips Chemical Co., 484 F. Supp. 2d 604, 613 n. 22 (S.D. Tex. 2007).

To the extent Mr. Malecki intends to provide opinions concerning whether the policy exclusions apply to the facts of this case, or whether KAAPA's tanks "collapsed," once the jury is properly instructed, it can answer these questions without the assistance of expert testimony.  "[C]ourts must guard against invading the province of the jury on a question which the jury [is] entirely capable of answering without the benefit of expert opinion."  Rottlund Co. v. Pinnacle Corp., 452 F.3d 726, 732 (8th Cir. 2006).

Malecki's opinions regarding the meaning of the Affiliated FM policy and its application to the facts at issue are not admissible under Rule 702, and his opinions concerning Affiliated FM's alleged improper handling of KAAPA's claims are irrelevant.  Affiliated FM's motion to exclude the expert  testimony of Donald Malecki should be granted.

        B.   Plaintiff's Motion Challenging the Admissibility of the Testimony of Defendant's Expert, John Field.

On July 25, 2008, the plaintiff filed a motion to exclude the testimony of John Field, defendant's expert forensic accountant. The plaintiff argues that Mr. Field used an improper and

unsupported method for calculating KAAPA's claim for lost revenue
for the period of November and December, 2004.  Mr. Field's report
is dated April 18, 2008.  Filing 185-2.  He was deposed on July 9,
2008.  Filing 185-5, at CM/ECF p. 2.

Pursuant to Judge Strom's order dated June 10, 2008, (filing
144), the deadline for filing motions challenging experts was June
16, 2008.[10]  The plaintiff has provided no explanation for failing
to timely file its motion to exclude all or part of Mr. Field's
expert testimony.

The undersigned further notes that Mr. Field's testimony
addresses lost income, i.e. business interruption losses, for the
time period when Denver Grouting was repairing the soil and
foundation beneath KAAPA's tanks in the fermentation area.  All,
or a very substantial portion, of KAAPA's lost production and
revenue during the November and December 2004 time frame was
therefore directly caused by faulty construction, which is not
covered under the policy.  A limited amount of lost revenue may be
attributable to repairing the tank agitators, which may be
compensable if the plaintiff proves "collapse," but this repair
took less than a day per tank.  Accordingly, the admissibility of
Mr. Field's testimony may be a moot issue, either because it is
wholly unnecessary, or because, in light of Affiliated FM's
limited exposure, the insurer may withdraw this witness.

---

[10]The order further states that pretrial motions requiring
an evidentiary hearing must be filed on or before July 25, 2008.
However, this deadline is inapplicable to plaintiff's motion to
exclude the testimony of defendant's expert.  An evidentiary
hearing is not required for resolution of a Daubert motion, and
the plaintiff has not requested a hearing.

The motion to exclude the testimony of John Field should be
denied as untimely filed.  The plaintiff has not explained why the
motion could not have been filed on or before the court's
deadline, and it likely cannot show it will be substantially
prejudiced at trial by the denial of this motion.

        C.    <u>Plaintiff's Motion to Preclude the Defendant from Using
Information Acquired after Coverage Was Denied to Defend
Against the Plaintiff's Bad Faith Claim</u>.

The undersigned has determined that defendant's motion for
summary judgment on the plaintiff's bad faith claim should be
granted.  KAAPA's motion to exclude all "[e]vidence Affiliated FM
acquired after it denied coverage for KAAPA's claims" as
irrelevant should accordingly be denied.  <u>Filing 193</u>, at CM/ECF p.
4.

        D.    <u>Plaintiff's Motion to Preclude the Defendant from
Referring to or Introducing Evidence Concerning Faulty
Workmanship, Faulty Construction, or Faulty Design</u>.

The plaintiff argues that the defendant lacks expert
testimony to prove the contractors who built its tanks violated
the standard of care.  The plaintiff claims that absent this
evidence, the defendant cannot prove "faulty construction,"
"faulty workmanship," or "faulty design," and should not be able
to mention or argue these policy exclusions at trial.

In responding to the defendant's motion for summary judgment,
the plaintiff argued that the policy's faulty workmanship,
construction, or design exclusions were irrelevant due to the
ensuing loss clause and that its losses were caused by the covered
perils of earth movement and collapse.  It argued that, at most,

KAAPA's recovery was merely limited by the faulty construction exclusion.  Filing 162, pp. 10-11.

The defendant need not present expert testimony in this case. The evidence establishes:

- the soil under KAAPA's tanks could not, without modification, bear the weight of KAAPA's proposed facility;

- a geotechnical engineer recommended installing a geogrid to resolve this problem;

- the geogrid manufacturer recommended using granular fill between the geogrid layers to create the necessary weight-bearing capacity;

- the plan specifications called for using compacted granular fill as infill for the ring wall and beneath the tank floors;

- the contractors used onsite soil to build the soils raft and infill the ring wall;

- the granular fill would have supported the tanks;

- the onsite soil compacted and did not provide sufficient support;

- this compaction caused the tanks to settle;

- this settling caused damage.

"There is nothing so highly technical about the facts of this case which is not within the common experience or understanding of the average layman." Jaeger v. Henningson, Durham & Richardson, Inc., 714 F.2d 773, 776 (8th Cir. 1983)(holding expert testimony was unnecessary to prove an architect's negligent supervision where the evidence included construction specifications calling for stairs with 10-gauge steel with angle stiffeners, the shop drawing called for 14-gauge steel without angle stiffeners, and an

expert stated that had 10-gauge steel with angle stiffeners been used, the stairs would not have collapsed). See also, Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc., 392 F.2d 472, 478 (8th Cir. 1968)(holding it requires no particular technical knowledge for jurors to determine whether an architect or contractor failed to adequately back-fill a ditch as required by contract, correct misaligned forms for pouring concrete, or understand the significance of a misaligned and crooked sewer pipe).

Affiliated FM did not need expert testimony to prove Fagen, or any of its subcontractors were negligent. The undisputed evidence of record proves faulty construction. The plaintiff's motion for an order, in limine, precluding the defendant from presenting evidence or referring to faulty workmanship, construction, or design should be denied.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Lyle E. Strom, United States Senior District Judge, pursuant to 28 U.S.C. §636(b)(1)(B) that the parties' motions be resolved as follows:

A. The defendant's motion for summary judgment, defendant, (filing 124), should be granted as to the following issues:

1) KAAPA's tanks were improperly constructed, and the faulty construction exclusion of the Affiliated FM policy is applicable to this case.

2) The plaintiff experienced no losses due to earth movement under the meaning of that term in the Affiliated FM policy and "Earth Movement Endorsement."

3) The plaintiff cannot recover losses, including business interruption losses, permanent and temporary repair costs, and plaintiff's mitigation costs directly caused by faulty construction.

4) The plaintiff cannot recover on its claim of bad faith.

5) The plaintiff cannot recover punitive damages.

In all other respects, the defendant's motion for summary judgment, or in the alternative for partial summary judgment, should be denied.

B.   The plaintiff's motion for partial summary judgment, (filing 128), should be denied.

C.   The defendant's motion challenging the admissibility of the opinions of plaintiff's expert witness, Donald Malecki. (filing 147), should be granted.

D.   The plaintiff's motion challenging the admissibility of the testimony of defendant's expert, John Field, (filing 183), should be denied.

E.   The plaintiff's motion for an order precluding the defendant from using information acquired after coverage was denied to defend against the plaintiff's bad faith claim, (filing 187), should be denied.

F.   The plaintiff's motion in limine to preclude the defendant from referring to or introducing evidence concerning faulty workmanship, faulty construction, or faulty design, (filing 192), should be denied.


FURTHER, IT HEREBY IS ORDERED:

1.   The pretrial conference in this case remains scheduled before the undersigned on August 5, 2008 at 10:00 a.m.

2.   The trial of this case remains set to commence before United States Senior District Judge Lyle E. Strom on August 22, 2008.

3.   The pretrial conference will include a serious discussion of settlement.  The parties are respectfully urged to immediately engage in mediation or other settlement techniques.  Failure to make arrangements to do so may result in the court mandating such action if circumstances so dictate.[11]

---

[11] The difficulties inherent in trying this case are legion. Despite the language herein which might indicate otherwise, as a very practical matter for the business entities involved to expect even the most able of litigation counsel to get a jury to understand the issues, much less be convinced that one party's position is "correct," borders on folly, not because our system

4.   Due the exigencies of this case, (see <u>Soliman v.</u> <u>Johanns,</u> 412 F.3d 920, 923 (8th Cir. 2005)), expedited deadlines for filing objections to this report and recommendation, and for responding to such objections are warranted.  Accordingly, the parties are given until the close of business on August 4, 2008 to file appropriate objections to this report and recommendation.  If such objections are filed, the parties are given until the close of business on August 11, 2008 to file responses to such objections.  No reply briefs shall be filed.

The parties are notified that failure to timely object to this recommendation under the schedule set forth in this order may result in a waiver of the right to appeal the district judge's adoption of findings in the recommendation.

DATED this 29th day of July, 2008.

BY THE COURT:

S/ *David L. Piester*

David L. Piester
United States Magistrate Judge

-----

is weak, but because it is a system of humans.  Counsel are urged, as they prepare for the final pretrial conference, to review with their clients the pitfalls of litigation and the costs, in addition to money, that even a "victory" may entail. The parties and counsel are in a much better position than any jury to justly resolve this dispute; they should seize the opportunity to do so.